UNITED STATES of America, Appellee,

v.

Jerome E. ROSEN, Defendant–Appellant.

Docket No. 04–3037–CR.

United States Court of Appeals, Second Circuit.

Argued: Feb. 16, 2005.

Decided: June 6, 2005.

Raymond J. Lohier, Jr., Assistant United States Attorney, New York City (David N. Kelley, United States Attorney for the Southern District of New York, Marc A. Weinstein, Harry Sandick, Assistant United States Attorneys, New York City, on the brief), for Appellee.

Maranda E. Fritz, New York City, for Defendant–Appellant.

Before: OAKES, KEARSE, and SACK, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Jerome E. Rosen appeals from a judgment entered in the United States District Court for the Southern District of New York following his plea of

guilty before Shirley Wohl Kram, *Judge*, convicting him of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 18 U.S.C. § 2, and conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371, and sentencing him principally to 14 months' imprisonment, to be followed by a three-year term of supervised release, and ordering him to pay a $21,000 fine. On appeal, Rosen contends principally that the district court should have allowed him to withdraw his guilty plea on the ground that the plea agreement he signed erred in predicting his sentence. Rosen also contends that the court miscalculated his sentence under the Sentencing Guidelines ("Guidelines"); and in any event he requests a remand in light of *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), for consideration of resentencing pursuant to this Court's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005). For the reasons that follow, we affirm the district court's refusal to allow Rosen to withdraw his plea of guilty; we remand for consideration of resentencing in accordance with *Crosby*.

## I. BACKGROUND

This case arises out of a scheme devised in 1997 by Michael Mitton, a principal of H & R Enterprises, Inc. ("H & R"), whose shares were publicly traded on the National Association of Securities Dealers Automated Quotation System Over–The–Counter market ("NASDAQ OTC Market"), and David Scott Heredia, president of a consulting firm, to manipulate the price of H & R shares. More than 3.7 million shares of H & R stock were issued to Mitton and his associates (collectively "Mitton") at prices between $.01 and $.50 per share, and shares were given to Heredia; the shares were placed in brokerage accounts in the names of companies owned by Heredia and Mitton. Heredia recruited brokers to create artificial trading volume and price increases so that members of the conspiracy could sell their shares at inflated prices.

One of the recruited brokers was Rosen, who was employed by J. Alexander Securities, Inc. ("J.Alexander"), a registered securities broker-dealer that was a marketmaker in H & R securities. In August and September 1997, Rosen was secretly given some 250,000 H & R shares at no cost, which he stashed in accounts under the name "OTCBB Holdings Limited" in Canada and the Cayman Islands. Rosen agreed to buy H & R stock from accounts controlled by Heredia and Mitton and sell it to other accounts controlled by Heredia and Mitton, at prices dictated by Heredia. Rosen knew that Heredia and Mitton were both the buyers and the sellers of the same blocks of stock and that these transactions thus resulted in no change in the shares' beneficial ownership. The coordinated circular sequence of transactions in which Rosen and other recruited brokers participated was a "daisy chain" that created the appearance of an active market for H & R stock. Mitton also caused H & R to issue a series of false and misleading press releases that further inflated the price of H & R stock. As a result, between September 19, 1997, and September 24, 1997, H & R's share price rose from $2 to more than $6.75. Rosen sold shares he had received, at no cost, at the inflated prices.

The daisy chain came undone when, on September 24, 1997, two brokerage houses refused to accept delivery of or pay for some 5 million H & R shares. With the unraveling of the daisy chain, the share price of H & R stock dropped to less than $2 in two days. In September 2002, Rosen and others were indicted for their actions in manipulating the H & R shares, charged

with conspiring to commit securities and wire fraud (Count One) and engaging in fraudulent securities · transactions (Count Two).

## A. *Rosen's Plea Agreement and Plea Allocution*

On January 21, 2004, Rosen and the government entered into a plea agreement ("Plea Agreement" or "Agreement"), in which the government agreed to forgo any further prosecution of Rosen (except for criminal tax violations) with respect to the securities fraud conspiracy described above, in consideration for Rosen's agreeing to plead guilty to both counts of the indictment. The Agreement described the counts and stated, *inter alia,* that "Count One of the Indictment carries a maximum sentence of five years' imprisonment" (Plea Agreement at 1) and that "Count Two of the Indictment carries a maximum sentence of ten years' imprisonment" (*id.*), for a "combined maximum term of imprisonment for Counts One and Two [of] 15 years" (*id.* at 2). As to Rosen's likely sentence, the parties stipulated that under the November 5, 2003 version of the Guidelines ("2003 Guidelines"), which would be in effect at the time of sentencing, Rosen's base offense level was 6, and that with a four-step upward adjustment pursuant to 2003 Guidelines § 2B1.1(b)(1)(C) for a loss amount between $10,000 and $30,000, and a two-step downward adjustment pursuant to § 3E1.1(a) for acceptance of responsibility, Rosen's total offense level was 8. (*See* Plea Agreement at 2–3.) The Agreement stated that "[b]ased upon the information now available to th[e United States Attorney's] Office (including representations by the defense), the defendant has zero criminal history points. In accordance with the above, the defendant's Criminal History Category is I." (*Id.* at 3.) "Based upon the[se] calculations," the parties stipulated

that Rosen's Guidelines imprisonment range would be 0–6 months. (*Id.*)

The Plea Agreement stated that the calculations stipulated to in the Agreement were not binding on the district court and that calculations by the court resulting in a different sentence would not entitle Rosen to withdraw his plea:

> *It is understood that . . . neither the Probation Department nor the Court is bound by the above stipulations,* either as to questions of fact or as to the determination of the proper Sentencing Guidelines to apply to the facts. . . .

> *It is understood that the sentence to be imposed upon the defendant is determined solely by the Court.* Th[e United States Attorney's] Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, *it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be the result of calculations different from those stipulated to herein.*

(Plea Agreement at 4 (emphases added).)

Finally, the parties stipulated that "[n]o additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement." (Plea Agreement at 5–6.) The Agreement stated that "[t]he defendant hereby acknowledges that he has accepted this plea Agreement and decided to plead guilty because he is in fact guilty." (*Id.* at 5.)

On January 21, 2004, after the Plea Agreement was signed, Rosen entered a plea of guilty to both counts of the indictment. Before accepting his plea, the district court, in accordance with Fed. R.Crim.P. 11, questioned Rosen to determine, *inter alia,* that he was competent to plead, had no dissatisfaction with his attorney, understood the constitutional rights

he would be giving up if he pleaded guilty, and understood the charges and the maximum sentences associated with each. (*See* Plea Transcript, January 21, 2004 ("Plea Tr."), at 2–10.) As to the charges against Rosen, the colloquy included the following:

THE COURT: .... Now, I want to tell you the elements of the counts to which you are pleading guilty.

Count One, you desire to plead guilty to the charge of conspiracy to commit securities fraud and wire fraud.... [T]his is what the government must prove beyond a reasonable doubt. 1, *that two or more persons agreed or conspired* to commit an offense, in this case to violate the laws of the United States[ ] that make it a crime *to commit securities fraud or wire fraud*, in violation of 18 U.S.C. Section 371; 2, *that you knew of that agreement or conspiracy; 3, that you intended to participate in the conspiracy;* and, 4, that you or another member of the conspiracy acted to effect an object of the conspiracy during the life of the conspiracy.

....

THE COURT: Now as to Count Two, to which you are pleading guilty to a charge of securities fraud, the government must establish beyond a reasonable doubt the following: 1, that in connection with the purchase or sale of the security, *you did any one of the following:* A, employed a device, scheme or artifice to defraud or, B, made an untrue statement of a material fact, or omitted to state a material fact that made what was said under the circumstances misleading, or, C, engage[d] in an act, practice or course of business that operated or would operate as a fraud or a deceit upon a purchaser or seller; 2, *that you acted willfully and knowingly and with the intent to defraud;* 3, that you used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the mails in furtherance of this fraudulent conduct.

(Plea Tr. 7–8 (emphases added).) Rosen stated that he had discussed the elements of each count with his attorney and did not wish to discuss them with her any further. (*See* Plea Tr. 7, 8.) The court continued:

THE COURT: *You understand each charge in that Indictment?*

THE DEFENDANT: *Yes, I do.*

THE COURT: *Now that I have told you your rights, do you still want to plead guilty?*

THE DEFENDANT: *Yes.*

THE COURT: All right. I want you to understand, also, Count One of the Indictment carries a maximum sentence of five years imprisonment ....

Count Two of the Indictment carries a maximum sentence of ten years imprisonment ....

The combined maximum term of imprisonment for Count[s] One and Two is 15 years.

....

*Do you understand that?*

THE DEFENDANT: *Yes.*

(Plea Tr. 8–10 (emphases added).) Exploring further with respect to Rosen's understanding of his possible sentence, the court asked as follows:

THE COURT: .... I want to ask you further, has anyone made any promise other than what's in this agreement to induce you to plead guilty?

THE DEFENDANT: No.

THE COURT: *Has anyone made any prediction, prophecy, or promise to you as to what your sentence will be?*

THE DEFENDANT: *No.*

THE COURT: *Do you understand that any recommendation of sentence agreed*

*to by you and the prosecution* or any agreement of [*sic*] the prosecution will not oppose your attorney's requested sentence *or anything in that plea agreement or anyone's predictions are not binding on the Court and that you might on the basis of your guilty plea receive up to the maximum sentence that I have described to you earlier?*

THE DEFENDANT: *Yeah, I do.*

(Plea Tr. 11–12 (emphases added); *see also id.* at 5–6 (determining that Rosen understood that the court "retain[s] the discretion . . . to impose" a sentence "up to the maximum permitted by law").)

The court then asked Rosen to describe in his own words what he had done to violate the law. He responded as follows:

THE DEFENDANT: Between September 22nd and September 24, 1997, I participated in trading designed to inflate the price of H & R stock and sold a portion of stock received at no cost at inflated price—at an inflated price.

(Plea Tr. 12.) The court allowed Assistant United States Attorney ("AUSA") Marc Weinstein to pose additional questions to flesh out Rosen's offense conduct:

MR. WEINSTEIN: . . . .

With respect to that period of time when Mr. Rosen participated in that scheme, did he do so with the agreement of others, with respect to the conspiracy count?

THE DEFENDANT: Yes, I did.

(Plea Tr. 12.)

MR. WEINSTEIN: . . . [W]ith respect to the shares that Mr. Rosen sold, did he receive those shares for free and thereby was able to sell them from his own personal accounts into the market at the inflated prices?

THE DEFENDANT: A portion of the stock received at that time had no cost.

THE COURT: And were you able to sell them at inflated prices?

THE DEFENDANT: Yes.

(Plea Tr. 12–13.)

The AUSA summarized the government's evidence against Rosen as follows:

[T]he government would call witnesses, to testify with respect to the nature of the trading scheme, who were involved in the trading scheme itself, as well as an analysis of the NASD trading records showing the actual trading that was done at the behest of Mr. Rosen or others in the scheme, as well as account records showing, first of all, the free shares received by Mr. Rosen and his selling into the market at the inflated prices.

(Plea Tr. 13–14.) The defense indicated that it did not dispute that summary. The court accepted Rosen's plea of guilty to both counts of the indictment.

B. *The PSR and Rosen's Motion To Withdraw His Plea*

Following the entry of Rosen's plea of guilty, the Probation Department prepared (and amended) a presentence report ("PSR") whose determinations differed from the stipulations in the Plea Agreement in three ways. First, the 2003 version of the Guidelines could not be applied without causing an *ex post facto* problem, because the 2003 version, unlike the November 1995 version that was in effect at the time of Rosen's offenses, contained a provision (§ 2B1.1(b)(14)(A)) requiring a four-step increase in offense level (which was not reflected in the Plea Agreement) for a defendant who was a registered broker. The PSR thus determined that the November 1995 version of the Guidelines ("1995 Guidelines") should be applied.

Second, the PSR determined that Rosen's total offense level should be 10, rather than 8, because, in addition to the base

offense level and adjustments to which the parties had stipulated, there should be a two-step offense-level enhancement pursuant to 1995 Guidelines § 2F1.1(b)(2)(A) because the offenses required "more than minimal planning." Third, contrary to "the information ... available to th[e United States Attorney's] Office (including representations by the defense) [that Rosen] ha[d] zero criminal history points" (Plea Agreement at 3), the PSR noted that Rosen had two prior convictions, placing him in criminal history category II, rather than I.

Given an offense level of 10 and a criminal history category of II, the 1995 Guidelines-recommended range of imprisonment was 8–14 months.

Rosen objected to the PSR, principally on the ground that its calculations resulted in a Guidelines range that would require imprisonment. He asked the district court for a ruling, or at least an indication, that the court would instead sentence him in accordance with the range of 0–6 months anticipated by the parties in the Plea Agreement. (*See* Hearing Transcript, April 14, 2004 ("Hrg.Tr."), at 5–7.) The court declined to commit itself. (*See id.* at 7–8.)

Rosen thereafter moved to withdraw his plea or, in the alternative, to have the court "impose a non-incarceratory sentence." (Rosen Memorandum of Law in Support of Motion To Withdraw Plea or, in the Alternative, Sentencing Submission, dated May 14, 2004 ("Rosen Withdrawal Motion Memorandum"), at 1.) Portraying Rosen as a participant who was "irrelevant to the trading activity of H & R stock" and who "was one of [the scheme's] victims" (*id.* at 3), the motion indicated that Rosen had entered into the Plea Agreement and pleaded guilty based on his belief that there was a "possibility and likelihood of no period of incarceration" (*id.* at 6), and

that the parties' "mutual mistake" (*id.*) as to the Guidelines range created "a substantial issue concerning the voluntariness and validity of the plea" (*id.*). Further, he argued,

[s]etting aside principles of contract law, the substantial disparity between the contents of the agreement and the position of the Probation Department also raises clear issues concerning the voluntariness of the plea. As this Court is well aware, Mr. Rosen has taken the position from the outset that he did not knowingly and deliberately participate in the manipulation of the stock of H & R. As the trial date approached, the government offered to Mr. Rosen a plea agreement that would place him in a guideline range of 0 to 6. Mr. Rosen was also advised by counsel that, in the context of a negotiated plea and where the amount at issue was stipulated to be approximately $20,000, the courts generally sentence individuals to the lower end of the applicable guideline range. Effectively, therefore, Mr. Rosen was given the opportunity to enter a plea that created a strong likelihood of a non-incarceratory sentence . . . .

. . . .

Mr. Rosen's plea was unquestionably predicated on his understanding that experienced attorneys, both the Assistant United States Attorney and his own counsel, had properly applied the Sentencing Guidelines and that the offered plea would permit him to resolve the case with a substantial likelihood of no incarceration.

To the extent that Mr. Rosen's understanding was wrong, that all attorneys involved in this matter had been operating under a mistake as to the application of the guidelines, and that this Court determines that his plea actually *requires* a substantial period of incarcera-

tion, Mr. Rosen could not and did not voluntarily accept the terms of the plea.

(Rosen Withdrawal Motion Memorandum at 7–8 (emphasis in original); *see also id.* at 9 ("Had Mr. Rosen been confronted with a plea agreement that required that he serve a substantial period of time in prison, he would certainly have rejected it.").)

The motion also suggested that Rosen was actually innocent of any crime. In addition to stating that "Mr. Rosen has taken the position from the outset that he did not knowingly and deliberately participate in the manipulation of the stock of H & R" (*id.* at 7), the motion stated that

> Mr. Rosen's actual conduct implicates a host of issues regarding whether he engaged in trading activity which is criminal. Mr. Rosen stated, at the time of the allocution, the extent of his own conduct: he did engage in trading which, we now know, facilitated the upward manipulation in the price of the stock. There remains now, as there has been throughout this prosecution, a significant issue as to whether those facts actually constitute the commission of a crime.

(*Id.* at 8.)

## C. *The Decision of the District Court*

The district court denied the motion to withdraw the plea. At the sentencing hearing, noting that a written opinion would follow, the court stated that a motion to withdraw the guilty plea can be granted "only if the defendant has raised a significant question about the voluntariness of the original plea, and no such question exists here. I went through the transcript of the plea allocution and the submissions of both parties, and the only reasonable conclusion to draw is that the defendant's plea was knowing and volun-

tary." (Sentencing Transcript, June 2, 2004 ("S.Tr."), at 2.)

In its Opinion, *see United States v. Rosen,* No. 02 CR. 1246, 2004 WL 1234037 (June 2, 2004) ("District Court Opinion"), the district court noted that the Rules of Criminal Procedure "provide[ ] that a defendant who has pled guilty may withdraw his plea before he is sentenced if he shows 'a fair and just reason for requesting the withdrawal,'" District Court Opinion, 2004 WL 1234037, at *1 (quoting Fed.R.Crim.P. 11(d)(2)(B)), but "that a 'defendant has no absolute right'" to such relief, District Court Opinion, 2004 WL 1234037, at *1 (quoting *United States v. Williams,* 23 F.3d 629, 634 (2d Cir.), *cert. denied,* 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994)). The court stated that

> [i]n determining whether there is a "fair and just reason" to grant a motion to withdraw a guilty plea prior to sentencing, a district court should consider: (1) whether the defendant has asserted his legal innocence; (2) the amount of time that has elapsed between the plea and the motion; and (3) whether the Government would be prejudiced by a withdrawal of the plea. *See* Fed. R. Cr. P. 32(d), Advisory Committee Notes (1983 Amendment); *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997). In order to withdraw a guilty plea, a defendant "must raise a significant question about the voluntariness of the original plea." *Torres,* 129 F.3d at 715. These stringent standards reflect a recognition that "[s]ociety has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas 'undermines confidence in the integrity of our [judicial] procedures, ... increas[es] the volume of judicial work, [and] delays and impairs the orderly administration of justice.'" *United States v. Sweeney,* 878 F.2d 68, 70 (2d Cir.1989) (quoting *United States v. Timmreck,* 441 U.S.

544

780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979)[) ].

District Court Opinion, 2004 WL 1234037, at *1. The court reasoned that the "fair and just reason" standard does "not ... allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal" simply because "he believes that he made a bad choice in pleading guilty." *Id.* .at *3 (internal quotation marks omitted). Given the societal interest in the finality of guilty pleas, " 'the fact that a defendant has a change of heart prompted by his reevaluation of ... the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.' " *Id.* at *2 (quoting *United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992)).

The district court found that Rosen had failed to present any fair and just reason to permit withdrawal of his plea and that the factors to be considered by the court weighed against him. For example, the court found that Rosen had not made any showing of innocence; rather, he had stated in the Plea Agreement " 'that he has accepted this plea Agreement and decided to plead guilty because he is in fact guilty.' " District Court Opinion, 2004 WL 1234037, at *2 (quoting Plea Agreement at 5). The court further found that the motion had not been made promptly; rather, Rosen had waited some four months to move. *See* District Court Opinion, 2004 WL 1234037, at *3. Finally, the court found that Rosen had not raised any significant question about the voluntariness of his plea. He had stated in his plea allocution that no one had threatened him or attempted to coerce him to plead guilty, and that no one had made any promises or predictions as to what his sentence would be. *See id.* Further, the court noted that the Plea Agreement itself stated explicitly that the government " 'does not[ ] make any promise or representation as to what

sentence the defendant will receive,' " and that " 'it is understood that *the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be the result of calculations different from those stipulated to* ' " in the Plea Agreement. *Id.* at *2 (quoting Plea Agreement at 4 (emphasis in District Court Opinion)).

The court concluded that Rosen's agreement to these provisions, along with his statements under oath at his plea allocution, severely undermined his assertion that he would not have pleaded guilty if he had known that he would be required to serve a substantial period of time in prison, *see* District Court Opinion, 2004 WL 1234037, at *2, and made his claim that his plea was involuntary "entirely unpersuasive," *id.* The court concluded that, "after a thorough review of both the text of the plea agreement and the transcript of the plea allocution, the only reasonable conclusion to draw is that the defendant's plea was knowing and voluntary." *Id.* at *3.

Rejecting Rosen's challenges to the Guidelines calculations in the PSR, *see* Part III below, the district court sentenced Rosen principally to 14 months' imprisonment, to be followed by a three-year term of supervised release, and ordered him to pay a $21,000 fine. This appeal followed; this Court granted Rosen's motion for bail pending resolution of the appeal.

## II. DENIAL OF THE MOTION TO WITHDRAW THE PLEA

Rosen challenges the district court's denial of his motion to withdraw his plea, contending principally (A) that the district court applied the wrong legal standard, (B) that the Plea Agreement is unenforceable because of mutual mistake, and (C) that his plea allocution was insufficient as a

matter of law. None of these contentions has merit.

### A. The Standard Applied to Rosen's Motion

Rosen contends that the district court, in stating that it could grant a motion to withdraw a plea of guilty " 'only if the defendant has raised a significant question about the voluntariness of the original plea,' . . . misstated the legal standard that governs a motion to withdraw a plea." (Rosen brief on appeal at 10 (quoting S.Tr. 2).) He contends that the court thereby indicated that a showing of involuntariness is the only way to make out a fair and just reason under Rule 11, whereas under the proper standard, "the court will permit the defendant to withdraw his plea 'if the defendant shows *any fair and just reason*' for the withdrawal." (Rosen brief on appeal at 10 (quoting Fed.R.Crim.P. 32(e) (2000)) (emphasis in brief).) For the reasons that follow, we disagree.

Criminal Rule 11(d)(2)(B) provides that a "defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R.Crim.P. 11(d)(2)(B) (eff.Dec. 1, 2002). The fair-and-just-reason standard was first articulated in the Rules in 1983, in subpart (d) of Rule 32, *see* Fed.R.Crim.P. 32(d) (1983) ("If a motion for withdrawal of a plea of guilty . . . is made before sentence is imposed . . ., the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason."). This incorporated the dictum in *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927), that a court has "discretion" to allow a plea of guilty to be withdrawn "if for any reason the granting" of the withdrawal motion "seems fair and just," *id.* at

224, 47 S.Ct. 582, a principle that the federal courts had thereafter "consistently applied to presentence motions." Fed. R.Crim.P. 32 Advisory Committee Note (1983). In 1994, the substance of the "fair and just reason" provision was moved, with stylistic differences, to subpart (e) of Rule 32. *See* Fed.R.Crim.P. 32(e) (2000) ("[i]f a motion to withdraw a plea of guilty . . . is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason"). In 2002, the provision was again relocated, this time to Rule 11 in order "to more clearly spell out in Rule 11(d) and 11(e) the ability of the defendant to withdraw a plea," Fed.R.Crim.P. 11 Advisory Committee Note (2002). As with the prior revisions, these changes "[we]re intended to be stylistic only," Fed. R.Crim.P. 32 Advisory Committee Note (2002). Thus, cases interpreting the former versions of Rule 32 are authority for the proper interpretation of the current Rule 11(d)(2)(B).

With respect to each of those versions of the Rule, we have made clear that although the Rule provides that a defendant may move to withdraw a guilty plea upon a showing of any "fair and just reason," it is basic that "[a] defendant has no absolute right to withdraw his plea of guilty." *United States v. Williams*, 23 F.3d 629, 634 (2d Cir.1994) (construing Rule 32(d) (1993)), *cert. denied*, 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994); *see, e.g., United States v. Gonzalez*, 970 F.2d 1095, 1099–1100 (2d Cir.1992) ("*Gonzalez*") (construing Rule 32(d) (1991)); *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.1997) ("*Torres*") (construing Rule 32(e) (1996)); *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir.1997) ("*Maher*") (same); *United States v. Karro*, 257 F.3d 112, 117 (2d Cir.2001) (construing Rule 32(e) (2000)); *United States*

*v. Schmidt*, 373 F.3d 100, 102–03 (2d Cir. 2004) ("*Schmidt*") (construing Rule 11(d)(2)(B) (2002)). Thus, contrary to Rosen's assertion that if the defendant shows any fair and just reason for the withdrawal "the court *will* permit the defendant to withdraw his plea" (Rosen brief on appeal at 10 (emphasis added)), the decision whether to grant the motion to withdraw is committed to the district court's discretion and will be reversed only for abuse of discretion, *see, e.g., Schmidt*, 373 F.3d at 102; *Torres*, 129 F.3d at 715; *Maher*, 108 F.3d at 1529; *Gonzalez*, 970 F.2d at 1100.

■ The court has that discretion where the moving defendant satisfies the court that there are valid reasons for withdrawal of the plea and the court concludes that those reasons outweigh any prejudice to the government and the strong societal interest in the finality of guilty pleas. In *Gonzalez*, for example, we stated as follows:

> Pursuant to Fed.R.Crim.P. 32(d) [ (1991) ], a district court may permit withdrawal of a guilty plea prior to sentencing "upon a showing by the defendant of any fair and just reason." Although this standard implies that motions to withdraw prior to sentence should be liberally granted, ... a defendant who seeks to withdraw his plea "bears 'the burden of satisfying the trial judge that there are valid grounds for withdrawal, taking into account any prejudice to the government.'" .... The Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal; however, the presence or absence of such prejudice may be considered by the district court in exercising its discretion.... The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.

970 F.2d at 1099–1100. In *Maher*, we stated essentially the same criteria, pointing out that

> [a] defendant has no automatic entitlement to have such a motion granted, for [s]ociety has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice.

108 F.3d at 1529 (internal quotation marks omitted). Most recently, in *Schmidt*, we stated the criteria as follows:

> In general, to determine whether the defendant has shown a "fair and just reason" to justify withdrawal, a district court considers, *inter alia:* (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea. [*United States v.*] *Couto*, 311 F.3d [179,] 185 [ (2d Cir. 2002) ]. Courts may also look to whether the defendant has "raise[d] a significant question about the voluntariness of the original plea." *United States v. Torres*, 129 F.3d 710, 715 (2d Cir.1997). The standard for withdrawing a guilty plea is stringent ....

*Schmidt*, 373 F.3d at 102–03.

■ In the present case, the district court in its written opinion, as described in Part I.C. above, set out and applied the

above standard. After stating the standard, *see* District Court Opinion, 2004 WL 1234037, at *1, the court ruled against Rosen in a section entitled "The Defendant Has Failed To Present A Fair And Just Reason To Permit Withdrawal Of His Plea," *id.* The court found that

> none of the factors that a district court should consider in deciding whether there is a "fair and just reason" to grant a motion to withdraw a guilty plea—(1) whether the defendant has asserted his legal innocence; (2) the amount of time that has elapsed between the plea and the motion; and (3) whether the Government would be prejudiced by a withdrawal of the plea—weigh in favor of the defendant.

*Id.* at *2. The court found that Rosen "has not asserted that he is innocent; in fact, just the opposite. In the plea agreement signed by the defendant, he acknowledged 'that he has accepted this plea Agreement and decided to plead guilty because he is in fact guilty.'" *Id.* (quoting Plea Agreement at 5). The court also found that Rosen had "waited approximately four months to attempt to withdraw his plea. Such a strategic maneuver is plainly contrary to the rationale for plea withdrawal," which is "to permit [a defendant] to undo a plea that was unknowingly made at the time it was entered," "not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *Id.* at *3 (internal quotation marks omitted). Having found that the claim-of-innocence and the elapsed-time criteria were not met by Rosen, the court did not reach, and was not required to reach, the question of whether withdrawal of the plea would cause the government prejudice.

Finally, the district court proceeded to find that Rosen's plea was voluntary, rejecting his contention that it was involuntary because he had pleaded guilty only based on his understanding that he would likely be sentenced to no prison time. The court noted, *inter alia*, Rosen's statement in the Plea Agreement that he was pleading guilty because he was in fact guilty; and Rosen's statements under oath during the allocution that his plea was not the result of any promises, other than those stated in the Plea Agreement, or of any threats or coercion, and that he had received no prediction or prophecy as to what his sentence would be. *See* District Court Opinion, 2004 WL 1234037, at *2–3.

■ The particular statement on which Rosen relies for his contention that the district court failed to apply the proper legal standard—*i.e.*, that "[t]he circumstances in which a court should grant a defendant's motion to withdraw a plea are extremely narrow," and that "[i]n essence, withdrawal is only permitted when a defendant has raised a 'significant question about the voluntariness of the original plea.' *See Torres*, 129 F.3d at 715," District Court Opinion, 2004 WL 1234037, at *3—was somewhat ambiguous, in that it was general in form and could be interpreted as purporting to define the universe of permissible bases for withdrawal. However, there plainly are circumstances in which a court will find it fair and just to relieve the defendant of a plea despite its voluntariness. For example, where a plea was entered voluntarily but the government thereafter materially breached the plea agreement, we have ruled that the defendant should be allowed to withdraw his plea. *See United States v. Palladino*, 347 F.3d 29, 34–35 (2d Cir.2003). Despite the generality of the district court statement on which Rosen focuses, we cannot agree with Rosen's contention that the court ruled that involuntariness is the only way in which a defendant can show a fair and just reason for plea withdrawal under

Rule 11, given the district court's explicit exploration of, *inter alia,* the criteria set forth in the precedents discussed above as to assertion of innocence and timeliness of motion and, as discussed in Part II.B. below, Rosen's contract-based argument for withdrawal.

Reading the district court's opinion as a whole, we interpret the court's statement that a plea withdrawal motion should not be granted unless the defendant has shown a significant question of voluntariness, citing *Torres,* to mean simply that such a motion cannot be granted without such a showing where an alleged basis of the motion is involuntariness. *See generally Torres,* 129 F.3d at 714–15 (a significant question as to voluntariness was required, the defendants having moved to withdraw their pleas on the ground that they had been pressured or forced to plead guilty). Where the motion argues that the plea was not voluntary, *a fortiori* the court must focus on voluntariness. Here, Rosen's motion to withdraw explicitly sought to raise "a substantial issue concerning the voluntariness and validity of the plea." (Rosen Withdrawal Motion Memorandum at 6; *see also id.* at 7 (purporting to "raise[ ] clear issues concerning the voluntariness of the plea").) Rosen stated in his motion that he had believed there was a substantial possibility of a sentence imposing no period of incarceration, and that "[t]o the extent that [his] understanding was wrong" and he would be required to serve a prison term, he "could not and did not voluntarily accept the terms of the plea." (*Id.* at 7–8.) The district court's discussion of voluntariness simply addressed a stated basis of Rosen's motion. We conclude that the district court applied the proper legal standard.

B. *The "Mutual Mistake" Challenge to Enforceability*

Rosen contends that "the existence of a mutual mistake as to the single most critical component of the plea agreement[—]the likelihood of a non-incarceratory" sentence—made the Plea Agreement unenforceable and hence required the court to allow him to withdraw his plea. (Rosen brief on appeal at 13.) The district court rejected the contention that, under "principles of contract law," the parties' mistaken understandings as to the applicable Guidelines range "render the agreement void or voidable," ruling that Rosen "is incorrect in asserting that contract law provides a basis for plea withdrawal here." District Court Opinion, 2004 WL 1234037, at *1. We agree.

In entering into the Plea Agreement, the parties indeed stipulated to their understandings as to particular Guidelines calculations and adjustments, as well as to the imprisonment range that would thereby result. But they also expressly took into account the possibility that those understandings might not prevail. As set forth in Part I.A. above, the parties stated in the Plea Agreement that "*[i]t is understood that ... neither the Probation Department nor the Court is bound by the above stipulations, either as to questions of fact or as to the determination of the proper Sentencing Guidelines to apply to the facts*" (Plea Agreement at 4 (emphasis added)). They stated in the Agreement that "[i]t is understood that the sentence to be imposed upon the defendant is determined solely by the Court." (*Id.*) And they stated in the Agreement that "*it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be the result of calculations different from those stipulated to herein.*" (*Id.* (emphasis added).) An agreement that has made such express provisions with respect to the possibility of a mistaken prediction as to sentencing calculations is not a proper candi-

date for rescission on the ground of mutual mistake when that possibility has come to fruition.

## C. *The Sufficiency of the Plea Allocution*

 Finally, Rosen challenges the sufficiency of his plea allocution, contending that it is questionable whether the conduct to which he admitted constitutes a crime; that he "could not and did not state that he devised or even knew at the time of th[e fraudulent] scheme or 'design' "; that "the conduct [he] described ... does not establish a factual basis for his guilty plea"; and that "the plea itself" was therefore "defective under Rule 11(f) [*sic* ]." (Rosen brief on appeal at 15.) This contention borders on the frivolous.

Criminal Rule 11(b)(3), whose substantive predecessor was Fed.R.Crim.P. 11(f) until December 1, 2002, provides that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R.Crim.P. 11(b)(3). Here, before accepting Rosen's plea of guilty, the district court plainly made such a determination. The court asked Rosen to describe in his own words what he had done to violate the law. Rosen responded: "Between September 22nd and September 24, 1997, I participated in *trading designed to inflate* the price of H & R stock and sold a portion of stock received at no cost at ... an inflated price." (Plea Tr. 12 (emphasis added).) He then further acknowledged that with respect to that period, he had participated in that scheme in agreement with others (*id.*) and that he had "receive[d] ... shares for free and thereby was able to sell them from his own personal accounts into the market at the inflated prices" (*id.* at 12–13). As detailed in Part I.A. above, the court had described all of the elements of the offenses charged in each count of the indictment. For Rosen to be guilty on the conspiracy count, the court stated, *inter alia*, that the government would have to prove that there were "two or more persons [who] agreed or conspired ... to commit securities fraud or wire fraud, in violation of 18 U.S.C. section 371," and that Rosen "*knew* of that agreement or conspiracy" and "*intended to participate in the conspiracy.*" (Plea Tr. 7 (emphases added).) For Rosen to be guilty on the substantive count of fraudulent trading, the court stated, *inter alia*, that the government would have to prove that Rosen had engaged in one of a number of different types of fraudulent activity, which the court proceeded to describe, and that Rosen "acted *willfully and knowingly* and *with the intent to defraud.*" (Plea Tr. 8 (emphases added).) In response to these descriptions, Rosen told the court that he had adequately discussed the elements of the offenses with his attorney, that he understood the charges, and that he still wanted to plead guilty. (*See* Plea Tr. 7–9.)

 A guilty plea is an unconditional admission of guilt, *see, e.g., Maher,* 108 F.3d at 1528, and constitutes "an admission of all the elements of a formal criminal charge," *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). As to those elements the plea is "as conclusive as a jury verdict." *LaMagna v. United States,* 646 F.2d 775, 778 (2d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981); *see, e.g., United States v. Berndt,* 127 F.3d 251, 258 (2d Cir.1997). Thus, despite the post-plea self-serving statements that Rosen did not know of the overall design or scheme (*see, e.g.,* Rosen brief on appeal at 9, 15), that he "ha[d] taken the position from the outset that he did not knowingly and deliberately participate in the manipulation of the stock of H & R" (Rosen Withdrawal Motion Memo-

randum at 7), and that he had no intent to defraud (*see, e.g.,* Rosen reply brief on appeal at 16), the record of Rosen's allocution and plea of guilty conclusively established that he knew all of the elements of the offenses with which he was charged, knew of the securities fraud conspiracy, intended to participate in it, and engaged in manipulative trading knowingly, intentionally, and with intent to defraud.

We see no error in the district court's denial of Rosen's motion to withdraw his plea of guilty.

## III. SENTENCING DECISIONS

In calculating Rosen's sentence under the 1995 Guidelines, the district court increased his offense level (a) by four steps as prescribed by § 2F1.1(b)(1)(E) for a loss amount between $20,000 and $40,000, and (b) by two steps pursuant to § 2F1.1(b)(2)(A) because the offenses required more than minimal planning. Rosen challenged those enhancements in the district court and pursues those challenges here. (He does not on this appeal challenge the increase of his criminal history category from I to II; with a total offense level of 8, as agreed in the Plea Agreement and a criminal history category of II, Rosen's Guidelines-prescribed prison term would have been 4–10 months.) On appeal, Rosen has added a challenge to the constitutionality of the Guidelines, citing *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The last contention has merit, given the Supreme Court's decision in *United States v. Booker,* ⸺ U.S. ⸺, 125 S.Ct. 738, 160 L.Ed.2d 621.

Rosen's sentence was imposed on June 2, 2004. Obviously, the sentencing judge did not sentence with awareness of *Booker,* which was decided in January 2005, or even of its harbinger *Blakely,* which was decided on June 24, 2004.

Since Rosen's case is now pending on direct review, *Booker* is applicable. However, since we see no indication in the record that Rosen challenged the constitutionality of the Guidelines in the district court, that challenge is reviewable only for plain error. Accordingly, under this Court's decision in *United States v. Crosby,* 397 F.3d 103, we will remand this matter to the district court to determine whether, had it known that the Guidelines were to be consulted on an advisory basis rather than applied mandatorily, Rosen would have received the same sentence.

In light of the *Booker* requirement that the sentencing court "consider" the Guidelines, *see Crosby,* 397 F.3d at 111 ("sentencing judges remain under a ... continuing duty to 'consider' the[ Guidelines], along with the other factors listed in [18 U.S.C. § ] 3553(a)"), we briefly address Rosen's appellate challenges to the district court's application of the loss and more-than-minimal-planning guidelines.

### A. Loss Amount

The 1995 Guidelines required that the offense level of a defendant convicted of a fraud offense be increased by four steps if the "loss" caused by the offense—defined in the 1995 Guidelines as "the value of the money, property, or services unlawfully taken," § 2F1.1 Application Note 7; *see also* § 2B1.1 Application Note 2—was more than $20,000 but not more than $40,000, *see* 1995 Guidelines § 2F1.1(b)(1)(E). That "value" need not be calculated with precision, *see* 1995 Guidelines § 2F1.1 Application Note 8; *United States v. Bryant,* 128 F.3d 74, 75 (2d Cir.1997), and the court may instead measure loss by reference to the defendant's gains, although using gain as a basis "ordinarily will underestimate the loss," 1995 Guidelines § 2F1.1 Application Note 8. The loss estimate may include amounts

that have been repaid to victims after discovery of the crime. *See, e.g., United States v. Matt,* 116 F.3d 971, 975 (2d Cir. 1997). Although the parties' "stipulation [as to loss amount] does not fix that amount as a matter of law" or bind the sentencing court, the court may properly rely on such a stipulation in finding facts relevant to sentencing. *United States v. Granik,* 386 F.3d 404, 411–12 (2d Cir. 2004).

In the present case, several of these principles were implicated. Toward the end of the fraudulent trading scheme, Rosen, on instructions from Heredia, caused his employer J. Alexander to buy some 600,000 shares of H & R stock at share prices at approximately $5.625, and to resell those shares to a brokerage firm that was involved in the scheme. However, when the latter firm refused to accept delivery of or pay for these (and other) shares, the scheme came to an abrupt halt; the share price plummeted to less than $2; and J. Alexander lost more than $1 million. Under the terms of his employment contract, Rosen was required to reimburse J. Alexander for any losses incurred in his trading activity. Rosen met that obligation by working for J. Alexander for a period of some six months without compensation, until he had generated trading profits that equaled the amount of the J. Alexander loss.

In the plea negotiations, the government agreed not to seek a loss enhancement based on the more-than $1 million J. Alexander loss. Instead, having found that one or more of the accounts in which Rosen stashed his free shares of H & R had gains totaling nearly $22,000, the government agreed to accept that total as the Guidelines loss amount. Thus, in the Plea Agreement, the parties stipulated that "four levels are added because the loss amount was more than $10,000, but less than $30,000." (Plea Agreement at 3 (reflecting the loss range for the four-step enhancement specified in the 2003 Guidelines).) The PSR concurred in the government's position; the nearly $22,000 on which the parties focused was within the range for a four-step offense-level increase under both the 1995 and 2003 Guidelines. In fixing the loss amount for Rosen's sentence, the district court adopted the factual findings in the PSR (*see* S.Tr. 8, 15) and accepted the parties' loss stipulation (*see id.* at 4 ("You agreed to the amount in the plea agreement."); *id.* at 6–8).

In the district court, Rosen had argued that it was inappropriate to attribute any loss to him because he reimbursed J. Alexander in full for its more than $1 million in losses. In his objections to the PSR, he portrayed himself as a "victim[ ]" of the fraudulent scheme (Letter from defense counsel Maranda E. Fritz to U.S. Probation Officer Johnny Y. Kim, dated March 24, 2004 ("Rosen Letter"), at 3), and he makes similar arguments on this appeal (*see, e.g.,* Rosen brief on appeal at 7, 18–21), contending that the loss amount attributed to him should have been zero and that the court could not fix the loss amount at $21,000 without making findings as to the basis for that figure. These arguments are meritless.

To begin with, the suggestion that Rosen was a victim of the scheme is frivolous. The PSR determined that

> **ROSEN** accumulated a gross profit of approximately $546,163.96, in connection with his sale of H & R shares. (Ultimately, **ROSEN** did not profit from his trading activities involving H & R stock, since his company J. Alexander, was left holding 600,000 H & R shares, and **ROSEN** was responsible for covering the losses related to these shares.)

(PSR at 8, ¶ 31.) This estimate of Rosen's gross profit from the manipulative scheme

was not substantially disputed by Rosen; indeed, it may have understated his gross profit. Rosen's letter raising objections to the PSR stated that "Rosen ... suffered a loss of greater than $1 million," for a *net ... personal loss of approximately $400,000*" (Rosen Letter at 3 (emphasis added)), thereby indicating that Rosen's gross gain was more than $600,000. Rosen admitted in his plea allocution that he had received H & R stock at no cost and sold it at inflated prices, and his plea of guilty constituted an admission that he conspired to manipulate the price of H & R stock and that he knowingly and intentionally engaged in fraudulent trading activity. He was not a victim.

In estimating the loss caused by Rosen's crime, the district court used the loss range to which the parties themselves had stipulated. The court has discretion to accept a loss amount to which the parties had expressly agreed and that was endorsed by the Probation Department; the court was not required to make findings as to the basis of such a stipulated and PSR-approved loss.

B. *More Than Minimal Planning*

The 1995 Guidelines provided for a two-step enhancement if the offense involved "more than minimal planning," 1995 Guidelines § 2F1.1(b)(2)(A), as "defined in the Commentary to § 1B1.1," *id.* § 2F1.1 Application Note 2. "More than minimal planning" was defined as

more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense .... "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune.

1995 Guidelines § 1B1.1 Application Note 1(f). Rosen contends that his conduct consisted merely of typical stock trading activity and that, therefore, his "involvement in this offense did not involve *any* planning." (Rosen brief on appeal at 21 (emphasis in original).) His argument is wide of the mark, for the focus of this enhancement is not on the level of a given "[defendant's] involvement" but rather, as indicated by § 1B1.1 Application Note 1(f), is on the nature of the offense.

Where the offense is the product of joint criminal activity, a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." 1995 Guidelines § 1B1.3(a)(1)(B). If a coconspirator has organized a crime that requires more than minimal planning, other coconspirators who were not planners are chargeable with that offense characteristic if it was "foreseeable to [them] that more than minimal planning would occur in order to" complete the crime. *United States v. Mizrachi*, 48 F.3d 651, 657 (2d Cir.1995). The sentencing court's ruling that a given offense reflected more than minimal planning is an application of the Guidelines to the facts, which is reviewable only for abuse of discretion. *See, e.g., United States v. Cropper*, 42 F.3d 755, 758 (2d Cir.1994).

In the present case, the district court could permissibly find that the creation, by coconspirators Heredia and Mitton, of the daisy chain of sales in order to inflate the price of H & R's shares required more than minimal planning. In particular, orchestration was required in order to match purchases and sales among coconspirators; to have such purchases and sales occur repeatedly in order to create an impression of strong market demand for the shares; and to have a sufficient number of participants, with assigned

transactional duties (buying, selling, brokering), in order that the absence of changes in beneficial ownership of the shares might be concealed. Without such coordination, the prices of H & R shares would have been left to be determined by ordinary market forces. Plainly, each individual trade by the coconspirators was not merely opportunistic but was instead part of a carefully orchestrated scheme to inflate the price of the stock.

Rosen plainly was a participant prior to the September 19–24 run-up of the H & R price, having secretly been given the bulk of his personal shares in August. In his plea allocution, Rosen stated that he had "participated in trading designed to inflate the price of H & R stock," and, "with respect to the conspiracy count," that he "participated in that scheme ... with the agreement of others." (Plea Tr. 12.) The need for orchestration of the circular transactions in order to execute the inflationary design must have been foreseeable to him. We see no error in the district court's interpretation of the more-than-minimal-planning guideline as having applicability to Rosen.

## CONCLUSION

We have considered all of Rosen's contentions on this appeal and have found in them no basis for reversal. We affirm the district court's denial of Rosen's motion to withdraw his plea of guilty. In light of the Supreme Court's decision in *Booker* and this Court's decision in *Crosby*, we remand to the district court for consideration, in conformity with *Crosby*, of whether Rosen should be resentenced.

The mandate shall issue forthwith.