10-2202-cr
USA v. Gonzalez

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Argued: April 11, 2011                                             Decided: July 22, 2011)

Docket No. 10-2202-cr

_____

UNITED STATES OF AMERICA,

<u>Appellee</u>,

- v. -

EFRAIN GONZALEZ, JR.,

<u>Defendant-Appellant</u>.

_____

Before:  KEARSE, MINER, and CHIN, <u>Circuit Judges</u>.

Appeal from a judgment of the United States District Court for the Southern District of New York, William H. Pauley III, <u>Judge</u>, convicting defendant, following his plea of guilty, of mail fraud, 18 U.S.C. § 1341, and conspiracy to commit mail fraud, federal-program fraud, and wire fraud, 18 U.S.C. § 371; sentencing him principally to 84 months' imprisonment; and ordering him to pay $122,775 in restitution.

Conviction and custodial sentence affirmed; restitution order vacated and remanded for further proceedings as to amount.

MICHAEL A. LEVY, Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Pablo Quiñones, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

LANCE CROFFOOT-SUEDE, PATRICK C. ASHBY, New York, New York (Linklaters, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Efrain Gonzalez, Jr. ("Gonzalez"), a former Senator in the New York State Legislature, appeals from a judgment entered in the United States District Court for the Southern District of New York following his plea of guilty before William H. Pauley III, Judge, convicting him on two counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 6 and 8 of the superseding indictment), one count of conspiracy to commit mail fraud and federal-program fraud, in violation of 18 U.S.C. § 371 (Count 2), and one count of conspiracy to commit mail fraud, federal-program fraud, and wire fraud, in violation of 18 U.S.C. § 371 (Count 3). Gonzalez was sentenced principally to 84 months' imprisonment, to be followed by a two-year term of supervised release, and was ordered to pay $122,775 in restitution. On appeal, he contends principally that the district court (1) abused its discretion in denying his motion to withdraw his guilty plea, (2) erred in calculating the imprisonment range recommended by the advisory Sentencing Guidelines ("Guidelines"), and (3) erred in ordering restitution without proof that the persons characterized by the government as victims were directly harmed by his offense conduct. For the reasons that follow, we vacate and remand with respect to the amount of the restitution order; in all other respects, we affirm.

I. BACKGROUND

The following description of the conduct underlying the present prosecution is drawn largely from the sentencing findings of the district court, adopting the facts described in the presentence report ("PSR"), to which there was no objection by Gonzalez, and from Gonzalez's statements under oath in pleading guilty to the above offenses.

A.  The Mail Fraud and Conspiracy Offenses

Gonzalez was a member of the New York State Senate from 1990 through 2008, representing a district in the Bronx.  During all or part of that period, the New York State ("State") Legislature ("Legislature") annually allocated $200 million to certain groups or projects for the public benefit ("public benefit funds"); of that annual total, elected members of the Senate were allowed to designate the recipients of $85 million.

Pathways for Youth, Inc. ("Pathways"), was a not-for-profit corporation founded with the stated purpose of helping to improve the lives of young people.  From October 1999 through January 2005, Gonzalez caused the Legislature to provide more than $400,000 in public benefit funds to Pathways. Pathways also received funding from a number of federal agencies, including the United States Departments of Health and Human Services, Labor, Education, and Justice; between October 1999 and July 2004, the total amount of federal funding to Pathways exceeded $4 million.

West Bronx Neighborhood Association, Inc. ("West Bronx" or "WBNA"), was a not-for-profit corporation whose bylaws stated that it was organized to foster an interest in, inter alia, civic and community affairs and welfare, and to promote, inter alia, social and civic responsibility in the

community. Gonzalez, having procured State funds for Pathways, caused Pathways to provide funding to West Bronx between 1999 and 2004.

The United Latin American Foundation, Inc. ("ULAF"), was a not-for-profit corporation whose certificate of incorporation stated that it was organized to, inter alia, raise funds for the benefit of residents of the Dominican Republic. Gonzalez caused Pathways to enter into consulting agreements with ULAF on ways to strengthen the quality of life for residents of the Bronx and northern Manhattan, with respect to, inter alia, housing and drug problems. ULAF too was a recipient of funds from Pathways.

1. Moneys From Pathways to West Bronx to Gonzalez

West Bronx, despite the corporate purposes set out in its bylaws, did not engage in any substantial amount of not-for-profit activity. Instead, WBNA funds were used to pay personal expenses of Gonzalez. Gonzalez was an honorary member of WBNA's board; WBNA's office adjoined Gonzalez's District Office in the Bronx; the two offices shared a common door; and Gonzalez placed members of his Senate staff in key operating positions at WBNA.

From October 1999 through January 2005, Gonzalez had the Legislature provide Pathways with $423,000 in funding. From October 1999 through July 2004, Gonzalez caused Pathways to make payments to WBNA totaling $462,500. From about March 1999 through about May 2006, WBNA funds were used to pay more than $400,000 of Gonzalez's personal bills, funding, inter alia, his membership in a vacation club in the Dominican Republic, his rental of a luxury apartment in the Dominican Republic for his wife, his rental of a summer residence in Monroe, New York, college tuition for his daughter, and his purchases of jewelry, apparel, and premium New York Yankees baseball tickets.

4

## 2. Moneys From Pathways to ULAF to Gonzalez

ULAF, having entered into consulting agreements with Pathways, proceeded to send Pathways reports describing work purportedly done by ULAF personnel on behalf of Pathways. Pathways in 2003 paid ULAF a total of $152,500 for the services described. In fact, ULAF had not performed any substantial work in connection with the contracts; it used funds it received from Pathways to pay personal expenses of Gonzalez and others.

Miguel Castanos, a former Gonzalez Senate staff employee and an indicted coconspirator in the present case, was installed as ULAF's president; ULAF's business address was Castanos's home address. Other coconspirators became signatories on ULAF's checking account and made payments to Castanos, to creditors of Gonzalez, and to creditors of one of Gonzalez's companies.

## 3. The Superseding Indictment and Proceedings Toward Trial

Gonzalez was arrested in August 2006. A 10-count superseding indictment filed in December 2006 named him in nine counts. He was charged with substantive counts of federal-program fraud and mail fraud with regard to West Bronx (Counts 5 and 6) and substantive counts of federal-program fraud, mail fraud, and wire fraud with regard to ULAF (Counts 7-9); Gonzalez and various codefendants were charged with conspiracy to commit mail and federal-program fraud with respect to West Bronx (Count 2) and conspiracy to commit mail, wire, and federal-program fraud with respect to ULAF (Count 3). Gonzalez was also charged with defrauding New York citizens of his honest services (Count 1), and money laundering conspiracy (Count 4). Each of the defendants initially pleaded not guilty.

5

Extensive discovery followed, and, principally for that reason, there were repeated adjournments of the date for trial. Eventually, trial was scheduled for May 4, 2009. In mid-April 2009, Gonzalez's attorney, Murray Richman, asked the district court to, inter alia, postpone the start of trial for one week and to allow Gonzalez to change attorneys. At the ensuing conference with the court, Richman stated as follows:

> I know it is late in the game and I hesitate even making this application, but I believe that Mr. Gonzalez is entitled to a trial that he feels he is entitled to. I have been involved in this case from the very beginning. There has been a complete divergence of views on how to handle this case in terms of what the evidence shows, what it doesn't show, how to handle the case. . . .
>
> . . . . [A]fter his . . . non-election . . . communications seemed to break down.
>
> . . . . We have met two times in the last couple of months in order to try to prepare for this case in order to get ready, and we have a different view as to what this evidence is, what the case shows, what counsel can do.
>
> I am in no way impugning my client's integrity. I think it is just an honest breakdown in how a case can be handled. He is of the opinion that there is one course of conduct that can be taken and that establishes his non-guilt. And I am of the opinion that, frankly speaking, that it does not. So we are at a divergence. We can't communicate and we have not communicated and it is difficult to defend him personally under those circumstances.
>
> My concern is that I don't want to throw the weight on him. It is easy to do that and it would not be fair, but we are just not getting this thing done.
>
> I recognize, your Honor, this case is an old case and, at this stage, it should have been tried months ago, years ago or whatever. But I am at that position where, if I go forward, I believe that I am involved in an ethical problem.

(Conference Transcript, April 24, 2009 ("Apr. 24, 2009 Conf. Tr."), at 2-4.)

The court rejected the suggestion that the disagreements Richman described between himself and Gonzalez constituted a sufficient basis for a change of attorneys so shortly before trial. (See id. at 5 ("Mr. Richman, you are a highly experienced and well qualified lawyer. I am sure that

there are any number of clients with whom you have had a disagreement over the years about how to approach a case.").) Noting that the May 4, 2009 trial date had been set on October 15, 2008, "after many, many extended adjournments," the court said, "You cannot wait until the eve of trial to report to the Court that you are having a difficulty with your client, especially when you know exactly what the landscape of this case is." (Id.) The court stated:

> We are going to go to trial, and I am not going to relieve you as counsel in the case.
>
> . . . .
>
> If Mr. Gonzalez wants a trial, he will have one. I will endeavor to make sure that it is as fair a trial as possible, but I am not going to relieve you as counsel in this case because we are going to trial, and there is absolutely nothing to indicate that any other lawyer is going to do anything differently than what you have done up to this point in time.

(Id.)

The court also addressed Gonzalez directly:

> Mr. Gonzalez, are you able to work with your lawyer?
>
> DEFENDANT GONZALEZ: At this time, no, your Honor.
>
> THE COURT: Well, when did that happen?
>
> DEFENDANT GONZALEZ: It happened a couple of months.
>
> THE COURT: Well, I will tell you what. You better start visiting his office and getting ready for trial because this appears to be nothing more than an effort to once again delay this trial for months. I can't be any clearer. Do you understand?
>
> Mr. Gonzalez, the reporter cannot take the nod of a head.
>
> DEFENDANT GONZALEZ: Yes, I understand, your Honor.

(Id. at 5-6.)

7

Richman had also asked the court to move the start of trial from May 4 to May 11. Richman and the government concurred that the trial would be shorter than had originally been anticipated because there would be two fewer defendants (see id. at 7-8)--a reference to the fact that less than a month earlier two of Gonzalez's codefendants, Castanos and the executive director of Pathways, had entered guilty pleas. The court granted the adjournment request; and, after discussing its planned daily schedule for trial, the court asked Gonzalez whether he would work with Richman; Gonzalez answered, "Yes, your Honor" (id. at 10).

B.  Gonzalez's Plea of Guilty

On May 7, 2009, the government sent Gonzalez an advisory letter in accordance with the suggestion in United States v. Pimentel, 932 F.2d 1029, 1034 (2d Cir. 1991) ("Pimentel letter"), stating the government's view of the likely advisory Guidelines sentencing range for Gonzalez on Counts 2, 3, 6, and 8 of the superseding indictment if Gonzalez were to plead guilty to, and give an appropriate allocution on, those counts.  The letter stated that, on the basis of the information then available to the government, the Guidelines-recommended range of imprisonment would be 87-108 months.

On May 8, Gonzalez, "pursuant to [the] Pimentel letter" (Plea Hearing Transcript, May 8, 2009 ("May 2009 Plea Tr."), at 2), moved to withdraw his plea of not guilty and to plead guilty to Counts 2, 3, 6, and 8.  Under oath, Gonzalez stated his desire to plead guilty and stated that he was satisfied with Richman's representation of him:

THE COURT:  Now, Mr. Gonzalez, your attorney has informed me that you wish to enter a plea of guilty.  Do you wish to enter a plea of guilty?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Have you had a full opportunity to discuss your case

8

with your attorney and to discuss the consequences of entering a plea of guilty?

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you satisfied with your attorney, Mr. Richman, and his representation of you in connection with this matter?

THE DEFENDANT: Yes, your Honor.

(May 2009 Plea Tr. 5-6.)

The court found: "On the basis of Mr. Gonzalez's responses to my questions and my observations of his demeanor here in my courtroom this afternoon, . . . he's fully competent to enter an informed plea at this time." (Id. at 6.) The court then told Gonzalez that it would describe the constitutional and other rights he would give up by pleading guilty and that the court would ask him questions that were designed to satisfy the court "that you wish to plead guilty because you are guilty and that you fully understand the consequences of your plea"; Gonzalez said he understood. (Id. at 6-7.) After hearing the explanations of those rights, the elements of counts 2, 3, 6, and 8, the maximum possible penalty for each of those counts, and the fact that the sentence to be imposed on him could not yet be determined, Gonzalez said he understood. (See id. at 7-15.) Gonzalez also stated that he understood that he was free to stand trial and not plead guilty:

THE COURT: If there were a trial, you would have the right to testify if you wanted to, but no one could force you to testify if you did not want to.

Further, no inference or suggestion of guilt could be drawn if you chose not to testify at a trial. Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand that by entering a plea of guilty today, you're giving up each and every one of the rights that I've described, that you're waiving those rights, and that you'll have no trial?

THE DEFENDANT: Yes, your Honor.

9

THE COURT: Do you understand, sir, that you can change your mind right now and refuse to enter a plea of guilty?

THE DEFENDANT: Yes, your Honor.

THE COURT: You do not have to enter this plea if you do not want to for any reason. Do you understand this fully, Mr. Gonzalez?

THE DEFENDANT: Yes, your Honor.

(Id. at 8-9.)

THE COURT: Now, has anyone, Mr. Gonzalez, offered you any inducements or threatened you or forced you to plead guilty?

THE DEFENDANT: No, your Honor.

THE COURT: Are you pleading guilty voluntarily and of your own free will?

THE DEFENDANT: Yes, your Honor.

(Id. at 15-16.)

After both Richman and the government expressed the view that there was an adequate factual basis to support Gonzalez's proposed plea of guilty, the court asked Gonzalez to state what he had done in connection with the crimes to which he sought to plead guilty. Gonzalez responded as follows:

From in or about March 1999 through in or about May 2006, I and others were involved in an operation where we conspired to pay my personal expenses using funds of the West Bronx Neighborhood Association. I caused one of my coconspirators to mail West Bronx checks to credit card companies, vendors to pay my personal expenses.

From in or about 2002 through in or about September 2004, I and others were involved in an operation where we conspired to pay my personal expenses using funds of the United Latin American Foundation, Incorporated. I caused one of my coconspirators to mail United Latin American Foundation, Incorporated check[s] to credit card companies and vendors to pay my personal expenses.

(Id. at 17.) Gonzalez stated that those entities had paid "200,000 or more" towards his personal

10

expenses (id.), in that he had caused West Bronx to pay "[a]bout 125,000, 126,000, that I recall" and had caused ULAF to pay $40,000 to $75,000 (id. at 17-18). Gonzalez said that when he caused a coconspirator to send such checks, he had understood that the mails would be used (see id. at 20-21) and had known that his actions were "wrong and illegal" (id. at 18).

The Assistant United States Attorney ("AUSA"), at the court's request, summarized the evidence that the government would present if Gonzalez were to proceed to trial. The AUSA stated that the government would prove, through exhibits and "the testimony of several cooperating witnesses," that Gonzalez had "created [WBNA] as a not-for-profit entity"; that "West Bronx raised funds from numerous individuals and entities by, among other things, holding annual fund raising gallas [sic] to support West Bronx's supposed community operations"; that West Bronx received approximately $462,000 from Pathways--tens of thousands of dollars at a time--in payment of invoices submitted by West Bronx to Pathways, "often at the Senator's express direction, that said simply, quote, for consultant services rendered, and stated an amount," but that "[i]n fact West Bronx did not provide . . . services"; and that "West Bronx primarily functioned to pay the personal expenses of Senator Gonzalez and at least one of his coconspirators," paying some "$440,000 towards the balances of" Gonzalez's personal credit cards and paying "more than $100,000 directly to numerous vendors to support a variety of aspects of Senator Gonzalez's personal life." (Id. at 18-20.) The government indicated that its proof with respect to Gonzalez's use of ULAF would be similar, showing that Gonzalez caused Pathways to "pay[] ULAF approximately $150,000 for work that ULAF largely did not perform," and that "Gonzalez and his coconspirators spent ULAF's money for their personal benefit . . . ." (Id. at 20.)

The court accepted Gonzalez's formal pleas of guilty to counts 2, 3, 6, and 8:

Mr. Gonzalez, because you acknowledge that you're guilty as charged in counts two, three, six, and eight of the indictment, and because I find you

11

know your rights and are waiving them knowingly and voluntarily, and because I find your plea is entered knowingly and voluntarily, and is supported by an independent basis in fact containing each of the essential elements of the offenses, I accept your guilty plea and adjudge you guilty of each of the offenses to which you have just pleaded.

(Id. at 22-23.)

The court initially scheduled sentencing for August 7, 2009, but adjourned it to mid-October at Gonzalez's request. A supplementary plea hearing was held on September 24, 2009, in order to conduct a further allocution because the court had "failed to question [Gonzalez] about the forfeiture allegations in the indictment." (Plea Hearing Transcript, September 24, 2009 ("Sept. 2009 Plea Tr."), at 2.) The court placed Gonzalez under oath and asked him, inter alia, whether he recalled pleading guilty in May; he said he did. The court asked whether Gonzalez remembered the court's discussion of the possible penalties for his offenses; Gonzalez said he did. The court asked whether Gonzalez now understood that, if he were convicted, the court could order him to forfeit assets; Gonzalez said he understood. The court then asked, "Knowing now as you do that a forfeiture could be imposed by this Court do you, nevertheless, reaffirm to this Court your plea of guilty to each of the four counts that you pled guilty to back on May 8, 2009?" Gonzalez responded, "Yes, your Honor." (Sept. 2009 Plea Tr. 4-5).

Sentencing was rescheduled for November 13, 2009. In the meantime, the court received an October 14, 2009 letter from Gonzalez's son Carlos, who claimed to have found among the materials produced by the government a document that would clearly exonerate his father. Carlos Gonzalez also complained that Richman's representation of Gonzalez had been deficient. Richman took issue with Carlos Gonzalez's letter, stating that he had spent many hours speaking with Gonzalez, preparing for trial, and preparing for sentencing, but that he had reviewed the letter with Gonzalez and that Gonzalez apparently shared many of his son's negative views about Richman's representation.

12

Richman requested a hearing, in light of the seemingly irreparable rift in the attorney-client relationship. At the requested hearing, held on November 9, Richman stated that the relationship between himself and Gonzalez appeared to be completely out of control, and he urged that a new attorney be appointed for Gonzalez. (See Hearing Transcript, November 9, 2009 ("Nov. 9, 2009 Tr."), at 2-4.)

Gonzalez himself stated that the problem was simply that he and Richman did not agree on "the numbers." (Id. at 4.) The court pointed out that, Gonzalez having already pleaded guilty, the disagreement could only be on a question with regard to sentencing, and it asked for a further explanation. Gonzalez responded:

> Your Honor, I made some new--some mistakes, clerical mistakes. And I humbly take responsibility for that. But, however, there is a numerical problem with those particular, in terms--mistakes. An analysis on those numbers has to be made and put forth and be argued.

(Id. at 5.) The government stated that it appeared that Gonzalez wished to challenge Guidelines loss amounts for purposes of sentencing and that if he felt he was not being ably represented, the government had no objection to his receiving a new attorney. (Id. at 6.)

The district court agreed to appoint a new attorney for Gonzalez, and it scheduled the next conference for November 20. The court also warned that if, at a Fatico hearing on the sentencing issue, Gonzalez testified in a way that undercut his sworn statements in his plea allocution, he risked losing Guidelines credit for acceptance of responsibility. (See id. at 7-9.)

At the November 20 conference, Gonzalez's new attorney stated that he needed a month or so to review the discovery materials relating to "the amount of moneys that allegedly were diverted for Mr. Gonzalez's benefit." (Hearing Transcript, November 20, 2009 ("Nov. 20 Tr."), at 3-4.) Counsel also solicited advice

> as to how the Court would want to approach the situation where Mr. Gonzalez

13

needed to proceed in a manner in which we would advocate to the Court that the amount of moneys that he allocuted to having misused when he pled guilty was incorrect.

. . . .

. . . . I'm letting the Court know that I think there is a high probability that Mr. Gonzalez's allocution regarding having misused approximately $200,000 will be the subject of an evidentiary hearing. The premise of that is that Mr. Gonzalez was incorrect when he spoke and allocuted and pled guilty.

(Id. at 4-5.) Counsel declined to say that he was considering making an application to withdraw Gonzalez's plea. (See id. at 5.)

C. Gonzalez's Motion To Withdraw His Guilty Plea

At the next court conference, held on January 15, 2010, Gonzalez's attorney stated:

I have been instructed by my client after much discussion that he would like . . . to move this court to withdraw his guilty plea. . . .

(Hearing Transcript, January 15, 2010 ("Jan. 2010 Tr."), at 2.)

In response to the court's inquiry as to the basis for the planned motion, Gonzalez's attorney stated that

one of the arguments in the motion will be that given the fact that about six weeks before his guilty plea, Mr. Gonzalez not only requested a new lawyer, but his own lawyer at the time told the court that he had an ethical problem with proceeding to trial, that upon the court's instruction, that Mr. Gonzalez would remain the client of Mr. Richman.

Over the ensuing four to six weeks, Mr. Gonzalez was not actually in a position to receive adequate counsel regarding whether or not to plead or to proceed to trial. As such, under the analysis, we would submit that his guilty plea was, in fact, not voluntary.

In addition to that, your Honor, we would argue that there was no prejudice to the government if the guilty plea is withdrawn and this case were to proceed to trial.

(Id. at 2-3.) The district court stated that it found it

14

rather stunning for Mr. Gonzalez to take this position. I thoroughly questioned him during his allocution, and he could not have been more knowing and voluntary and he acknowledged that he had discussed the matter at length with his lawyer.

So if he is going to be telling me as part of his motion that he was not being truthful with the court at the time that he was sworn to be truthful with the court, I'll be considering that in connection with the case, too, but it is his decision.

(Id. at 3.)

In February 2010, Gonzalez submitted a written motion and affidavit in support of his request. His affidavit stated that Richman had been a longtime friend who was representing him for free, and it continued in relevant part as follows:

2. From the beginning, I insisted upon taking my case to trial. However, it quickly became evident to me that Mr. Richman did not wish to proceed to trial.

3. Because it was clear to me that Mr. Richman and I disagreed on how my case should proceed, I sensed that he was not adequately preparing for trial during 2007 and 2008. I believe this negatively impacted how Mr. Richman conducted discovery and examined evidence. Furthermore, although Mr. Richman interviewed four minor witnesses in preparation for trial in this matter, I do not think he adequately pursued key defense witnesses, including those whom I specifically identified.

4. From the fall of 2008 through the spring of 2009, Mr. Richman and I did not communicate effectively and rarely discussed my case, despite the fact that, on October 14 [sic], 2008, a definite trial date was set for May 4, 2009. Rather than improving as the trial date approached, I sensed that my relationship with Mr. Richman was becoming increasingly contentious and strained. I did not have confidence in Mr. Richman's preparedness, did not believe he was able or willing to address key issues for my defense, or trust that we could agree on a trial strategy if he even would take my case to trial. However, since Mr. Richman was a close personal friend, was conducting his representation for free, and because I could not afford a different attorney, I felt powerless to demand that Mr. Richman devote more time and resources to my defense. Although I never wavered in my desire to prove my legal innocence, it was obvious to me that Mr. Richman seemed wholly uninterested in trial preparation, wanted me to plead guilty, and was pressuring me to produce this outcome. As a result, I began to feel that I needed new counsel around January 2009.

15

5. On April 13, 2009, Mr. Richman filed an ex parte letter to the Court requesting to withdraw from the case.

6. At the April 24, 2009 conference in which the Court heard Mr. Richman's motion to withdraw, I informed the Court that I could not work with Mr. Richman. Mr. Richman informed the Court that he would face an ethical problem if he represented me at trial. The government suggested that the Court inquire further into whether a new lawyer would be able to represent me in the manner that I was requesting. However, the Court instructed me to listen to Mr. Richman and to take his advice. The Court then denied Mr. Richman's request to withdraw. Once the Court instructed me to retain Mr. Richman as my counsel, even after Mr. Richman said that he had an ethical problem representing me at trial, I did not believe that there was any way that I could obtain new counsel to represent me.

7. After the Court denied Mr. Richman's motion to withdraw, I was, in fact, forced to maintain Mr. Richman as my counsel and to heed his advice.

8. On May 7, 2009, I had a meeting at Mr. Richman's office to discuss case issues. When I left that meeting, I still wanted to proceed to trial and had not decided to plead guilty.

9. Before and up to the May 8, 2009 hearing, I did not wish to plead guilty. Upon arriving at the courthouse on May 8, Mr. Richman and I convened in the cafeteria to discuss my case, and I still did not want to plead guilty. But, Mr. Richman continued to exert tremendous pressure upon me to change my plea. Understanding that Mr. Richman did not want to go to trial, and with the Court refusing to allow me alternative counsel, it began to appear that pleading guilty was my only option. I succumbed to these pressures and decided to plead guilty moments before the hearing began. Given the last-minute nature of my plea, I did not have sufficient time to prepare. The majority of my allocution was read from a script. I did not fully understand the import of my words. When questioned by the Court, I felt pressured to keep repeating "yes," and answered questions based upon what the government said I had done. I thought I was supposed to respond in this manner.

10. Having never desired to plead guilty, I regretted and wished to retract my plea almost immediately. So I informed Mr. Richman that I had made a mistake and imparted the same sentiment to my family and friends. However, because I felt that Mr. Richman's presence as counsel had forced me into pleading guilty and that the breakdown in our communication was irreparable, I did not know what I could do for as long as Mr. Richman continued to serve as my lawyer.

11. For those reasons, I affirmed my guilty plea at the September 24, 2009 hearing with Mr. Richman still as my counsel. When I did so, I was

16

under the same pressure to plead guilty as I was before and during the May 8, 2009 hearing.

12. Over time I became increasingly frustrated and was unsure how to get information before this Court about my situation. I approached my probation officer, but she offered little advice beyond the suggestion that I talk to my lawyer, which was not a tenable solution under the circumstances.

13. Eventually, my son Carlos submitted his letter, dated October 14, 2009, to the Court, which detailed my troubles and once again stressed my desire for new counsel. This letter led to the November 9, 2009 conference at which I was granted alternative counsel. Now that Mr. Richman no longer represents me, I finally see withdrawing my guilty plea as a viable possibility, one that will allow me to prove my legal innocence.

(Affidavit of Efrain Gonzalez, Jr., dated February 4, 2010 ("Gonzalez Aff."), ¶¶ 2-13.) Thus, Gonzalez argued principally that his guilty plea was involuntary, the product of mental coercion.

In a written submission and in oral argument, the government opposed the motion. It argued principally (1) that in light of Gonzalez's sworn allocution at his plea hearing and his reaffirmation of his plea of guilty some four months thereafter, his statements in his affidavit were entirely unworthy of belief; and (2) that the motion did not come close to meeting the standards set by the Second Circuit for the granting of such motions.

In a Memorandum & Order dated April 8, 2010, reported at 2010 WL 1640186, the district court denied Gonzalez's motion. The court painstakingly described the protracted pretrial proceedings and the repeated need for adjournments of the trial date from November 26, 2007--the date that had first been set on May 11, 2007--to April 28, 2008, then to October 6, 2008, then to May 4, 2009, and finally to May 11, 2009, two years after the initial trial date had been set. See 2010 WL 1640186, at *1-*2. The court also noted the request by Richman, just three weeks before the May 4, 2009 scheduled start of trial (in a case whose proceedings had spanned nearly three years), to allow Gonzalez to change attorneys. The court noted that at the hearing on that motion Gonzalez had "confirmed that he would work with Richman as trial approached." Id. at *2.

17

The court quoted the explicit statements by Gonzalez, made in support of his motion to change his not-guilty plea to a plea of guilty, describing the criminal conduct in which he had engaged, see 2010 WL 1640186, at *1. And it quoted the plea hearing colloquy in which Gonzalez, when asked whether anyone had offered him any inducements or threatened him or forced him to plead guilty, responded that no one had; when asked whether he had had a full opportunity to discuss the case with Richman and to discuss the consequences of pleading guilty, said he had; when asked whether he was satisfied with Richman and Richman's representation, said he was; and when asked whether he was pleading guilty voluntarily and of his own free will, said he was. See id. at *2. The court noted that at the plea hearing it had questioned and observed Gonzalez and had found that he was "fully competent to enter an informed plea" and that Gonzalez had "entered his plea 'knowingly and voluntarily.'" Id. (quoting May 8 Plea Tr. 6, 22).

The court also noted that the voluntariness of Gonzalez's plea was consistent with his statements both before and after his plea hearing. "Prior to pleading guilty, Gonzalez [had] executed an 'Advice of Rights Form' in which he confirmed that his decision to plead guilty was 'freely and voluntarily made' and that he was 'satisfied with how [his] attorney represented [him],'" and "confirmed that he '[had] not been induced to plead guilty by any force, coercion, pressure or fear.'" Id. (quoting Court Exhibit 1, see May 2009 Plea Tr. 3). And thereafter, "[o]n September 24, 2009, at a conference to advise Gonzalez on the possibility of a forfeiture penalty as a result of his guilty plea, he reaffirmed his guilt on all four counts of the Superseding Indictment to which he had pled four months earlier." 2010 WL 1640186, at *3.

Pointing out that a court is allowed, before sentencing, to permit a defendant to withdraw his plea of guilty if he shows "a fair and just reason for requesting the withdrawal," Fed. R. Crim. P. 11(d)(2)(B), and citing cases such as United States v. Rosen, 409 F.3d 535, 546 (2d Cir.

18

2005) ("Rosen"); United States v. Hirsch, 239 F.3d 221, 225 (2d Cir. 2001) ("Hirsch"); United States v. Sweeney, 878 F.2d 68, 70 (2d Cir. 1989); United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997) ("Torres"); and United States v. [José] Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992) ("[José] Gonzalez"), see, e.g., 2010 WL 1640186, at *4-*5, the court noted that society has a strong interest in the finality of guilty pleas and that such pleas carry a strong presumption of accuracy. Among the considerations pertinent to the decision on a motion to withdraw a plea of guilty are whether the defendant has asserted his legal innocence and has done so with reference to evidence to support that assertion, whether the motion has been timely or belated, and, if the defendant asserts that his plea was not voluntary, whether he has made a sufficient showing to raise a significant question as to voluntariness, see 2010 WL 1640186, at *4; id. at *5 ("a defendant cannot rely on 'bald statements that simply contradict what he said at his plea allocution'" (quoting Torres, 129 F.3d at 715)).

The court concluded that Gonzalez had not met his burden of proof under that standard: "Submitting only a personal affidavit and transcripts of prior hearings before this Court, Gonzalez' application is bereft of any new facts that call into question his plea." 2010 WL 1640186, at *4.

Gonzalez's application to withdraw his plea presents the paradigm of the defendant who attempts to undermine the integrity of the judicial process. See United States v. Woosley, 440 F.2d 1280, 1281 (8th Cir.1971) ("the plea of guilty is a solemn act not to be disregarded because of belated misgivings about the wisdom of the same"). The notion that the free will of a long-time New York State senator was overridden by the imminence of trial, coercion by his attorney, or pressure from this Court is preposterous. The protracted pre-trial proceedings afforded Gonzalez many opportunities to pursue the trial he now desires. Gonzalez's suggestion that he "succumbed to . . . pressures and decided to plead guilty moments before the hearing began" and that he "did not fully understand the import of [his] words" is contradicted by the record leading to his plea and all of his actions after the plea, including his reaffirmation of his guilt four months later and his assertion two weeks before sentencing that his dispute with Richman concerned the loss amount. Even after this Court appointed new counsel for Gonzalez on November 9 because of his differences with Richman over sentencing, Gonzalez raised no issue regarding his plea. Indeed, at a subsequent conference on November 20, Gonzalez's new attorney, in line with Gonzalez's objection to the loss amount,

19

noted that he needed time "to analyze the discovery in order to address the[se] concerns." Although Gonzalez claims that . . . he has doubted the voluntariness and wisdom [of] his plea since May 2009, he waited to raise those concerns with his attorney.

The remainder of his self-serving affidavit is also insufficient to establish a fair or just reason that permits withdrawal--rather than referencing evidence that casts doubt on his plea, Gonzalez offers only a perfunctory statement that withdrawal will "allow me to prove my legal innocence." A reference to corroborating facts--as opposed to a "bald statement" of innocence--is essential if a court is to credit a defendant's present claims of innocence--sworn under oath--over his prior (and now contradicted) admissions of guilt under oath. See Torres, 129 F.3d at 715. Conclusory claims of innocence that leave a court guessing when a defendant is being truthful are inadequate to support withdrawal. See United States v. Hirsch, 239 F.3d 221, 225 (2d Cir.2001); see also [United States v.] Hyde, 520 U.S. 670, 677, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997) (noting that the withdrawal of a plea without sufficient cause "would degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess").

The statements Gonzalez now proffers are contradicted by the facts. Gonzalez characterizes his plea as "last-minute" and claims he "did not have sufficient time to prepare . . . [and] . . . read from a script." Yet he fails to explain how his decision could have been "last minute" given that his attorney scheduled the plea the prior day and that Gonzalez read and signed the "Advice of Rights Form" prior to his allocution and stated under oath that no one had pressured him to plead guilty. Moreover, Gonzalez reaffirmed his guilt under oath in another proceeding almost five months later.

2010 WL 1640186, at *5-*6 (second "under oath" emphasized in original; other emphases added).

The court also found that "[t]he seven[sic]-month delay in Gonzalez's request to withdraw his plea also weighs heavily against him," id. at *6, contributing to the court's doubt as to the veracity of Gonzalez's affidavit:

The substantial delay undercuts the sincerity of Gonzalez's epiphany. Over the last three years, Gonzalez had many opportunities to go to trial, as he now claims he desires. His eleventh-hour decision to plead guilty came only when it was clear that the May 2009 trial date would not be adjourned. Gonzalez's effort to undermine his calculated decision to plea on the cusp of trial cannot succeed given the "strong interest" society has in the final resolution of a criminal case.

Id. (emphasis added). The court noted in addition that, although the government was not required to

20

show prejudice, given Gonzalez's failure to show sufficient grounds for plea withdrawal, the late withdrawal would cause various types of unfairness to the government. See id. at *7. The court concluded:

> After twice knowingly and voluntarily pleading guilty, the time has come for Gonzalez to face the consequences for his serious criminal conduct.

Id.

D. Sentencing

Gonzalez's sentencing took place on May 25, 2010. As discussed in greater detail in Part II.B. below, the district court, over Gonzalez's objection, calculated his Guidelines offense level by, in part, applying a four-step enhancement on the ground that Gonzalez's offenses involved 50 or more victims. The advisory-Guidelines-recommended range of imprisonment, as calculated by the court, was 108 to 135 months. After considering the factors set out in 18 U.S.C. § 3553(a), the court imposed a non-Guidelines sentence, sentencing Gonzalez principally to a total of 84 months' imprisonment, to be followed by a two-year term of supervised release. The five counts to which Gonzalez did not plead guilty were dismissed on motion of the government.

A decision on restitution was postponed pending the district court's receipt of appropriate information with respect to a claim by the City of New York for restitution in place of Pathways, to which it had provided funding but which by then had ceased to exist. In an order dated August 23, 2010, the court rejected the claim of the City but, over Gonzalez's objection, ordered Gonzalez to pay $122,775 in restitution to contributors to WBNA. (See Part II.C. below.)

This appeal followed.

## II. DISCUSSION

On appeal, Gonzalez principally challenges the denial of his motion to withdraw his guilty plea. He also challenges the district court's calculations informing the Guidelines-recommended range of imprisonment and the order requiring him to pay restitution. For the reasons that follow, we find potential merit only in one aspect of his challenge to the order of restitution.

A. The Denial of Gonzalez's Motion To Withdraw His Guilty Plea

Gonzalez contends that the denial of his motion to withdraw his plea of guilty constituted an abuse of discretion because the district court improperly "concern[ed] itself more with protecting the trial date than with protecting Mr. Gonzalez from incapable, unwilling, and unprepared counsel" (Gonzalez brief on appeal at 33). He argues principally (1) that the court erred because it "paid no more than perfunctory attention to Mr. Gonzalez's subjective state of mind, and dismissed out of hand as 'preposterous' that a 'New York State senator was overridden' by any confluence of events and circumstances" (id. at 31); (2) that it was "nonsensical" for the court to require him to make a showing of legal innocence in support of his plea (id. at 45); (3) that he made a sufficient demonstration of innocence by showing that his attorney was "incapable, unwilling, and unprepared" to go to trial (e.g., id. at 44), and (4) that his withdrawal motion was timely because it was made shortly after he obtained new counsel. These contentions are meritless.

Rule 11 of the Federal Rules of Criminal Procedure provides that after a defendant has pleaded guilty but before he has been sentenced, the court may allow him to withdraw his plea of guilty "if . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B); see generally Rosen, 409 F.3d at 545-46 (discussing Rule 11(d)(2)(B) and its

antecedents, Fed. R. Crim. P. 32(d) (1983-1994) and 32(e) (1994-2002), and noting that "cases interpreting the former versions of Rule 32 are authority for the proper interpretation of the current Rule 11(d)(2)(B)").  The defendant has the burden of demonstrating valid grounds for withdrawal.  See, e.g., Torres, 129 F.3d at 715 (discussing Rule 32(e)); Maher, 108 F.3d at 1529 (same); [José] Gonzalez, 970 F.2d at 1100 (discussing Rule 32(d)).  The decision whether to allow the requested withdrawal is committed to the sound discretion of the district court, see, e.g., Rosen, 409 F.3d at 546; "[a] defendant has no absolute right to withdraw his guilty plea," Torres, 129 F.3d at 715 (internal quotation marks omitted).

> "In general, to determine whether the defendant has shown a 'fair and just reason' to justify withdrawal, a district court considers, inter alia: (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea."

Rosen, 409 F.3d at 546 (quoting United States v. Schmidt, 373 F.3d 100, 102-03 (2d Cir. 2004) ("Schmidt") (discussing Rule 11(d)(2)(B))).  There is no burden on the government to show that it would be prejudiced by the withdrawal of the guilty plea unless the defendant has shown sufficient grounds to justify withdrawal.  See, e.g., Rosen, 409 F.3d at 546; Torres, 129 F.3d at 715; Maher, 108 F.3d at 1529; [José] Gonzalez, 970 F.2d at 1100.

When the defendant has moved to withdraw his plea on the ground that it was not entered voluntarily, "a fortiori the court must focus on voluntariness." Rosen, 409 F.3d at 548. "The voluntariness of [a] plea can be determined only by considering all of the relevant circumstances surrounding it." Brady v. United States, 397 U.S. 742, 749 (1970). Given that "[s]olemn declarations in open court carry a strong presumption of verity," Blackledge v. Allison, 431 U.S. 63, 74 (1977), and given "the strong societal interest in the finality of guilty pleas," Rosen, 409 F.3d at 546; see, e.g.,

Blackledge, 431 U.S. at 71; Schmidt, 373 F.3d at 103; Maher, 108 F.3d at 1529, a "'defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw [his] guilty plea,'" United States v. Hirsch, 239 F.3d 221, 225 (2d Cir. 2001) ("Hirsch") (discussing Rule 32(e)) (quoting Torres, 129 F.3d at 715).

Whatever the basis for the motion, "'[t]he standard for withdrawing a guilty plea is stringent,'" Rosen, 409 F.3d at 546 (quoting Schmidt, 373 F.3d at 103). And "[n]o hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory." [José] Gonzalez, 970 F.2d at 1100.

Determinations as to credibility and the resolution of conflicting evidence are primarily entrusted to the judge who hears the evidence. See, e.g., United States v. Hughes, 325 F.2d 789, 792 (2d Cir. 1964). A court's decision on a motion for plea withdrawal is reviewable only for abuse of discretion. See, e.g., Rosen, 409 F.3d at 546; Hirsch, 239 F.3d at 225; Torres, 129 F.3d at 715; Maher, 108 F.3d at 1529. A district court abuses its discretion when its decision rests on an error of law or a clearly erroneous factual finding, or when its decision, though not necessarily the product of legal error or a clearly erroneous finding of fact, cannot be located within the range of permissible decisions. See, e.g., United States v. Figueroa, 548 F.3d 222, 226 (2d Cir. 2008); Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir. 2001).

We see no abuse of discretion here. First, it is clear that the district court made its decision within the legal framework we have just discussed. The court expressly took account of each of the factors that appropriately inform the balancing of, inter alia, the societal interest in the finality of guilty pleas and the presumption that sworn statements made in open court are true, against Gonzalez's proffered reasons for seeking to recant those statements and undo his plea.

24

Nor do we see any clearly erroneous finding of fact or any basis for concluding that the court's refusal to set aside Gonzalez's guilty plea was beyond the realm of permissible decisions. Gonzalez's assertion that the district court sacrificed his rights because it was in a hurry to get the case tried (see Gonzalez brief on appeal at 33 (asserting that the court "concern[ed] itself more with protecting the trial date than with protecting Mr. Gonzalez from incapable, unwilling, and unprepared counsel")) is belied by the record. It is indisputable that the court had granted adjournment after adjournment, leaving the final trial date only a few months short of the third anniversary of the case's inception. Any suggestion that the district court was attempting to pressure Gonzalez to plead guilty (e.g., Memorandum of Law in Support of Motion by Efrain Gonzalez, Jr. To Withdraw His Guilty Plea ("Gonzalez Withdrawal Motion Memorandum") at 4 (referring to Gonzalez's perception of "the Court's pressure that he plead guilty")) is not supported by any evidence and is entirely contradicted by the record. For example, at the April 24, 2009 conference, the court said, inter alia, "we are going to trial"; "[w]e are going to go to trial"; "[i]f Mr. Gonzalez wants a trial, he will have one." (Apr. 24, 2009 Conf. Tr. 5). At the next conference, held on April 30, the court reaffirmed, "We are going to select a jury and try this case starting on May 11" (Conference Transcript, April 30, 2009 ("Apr. 30, 2009 Conf. Tr."), at 21), and discussed, inter alia, the number of peremptory challenges that Gonzalez and his remaining codefendant would have at trial and the manner in which those peremptories would be exercised (see id. at 21-22).

Further, while Gonzalez argues that the district court erred "[b]y ignoring [his] subjective state of mind" (Gonzalez brief on appeal at 31), that argument is meritless. The court was not required to accept the belated assertions of mental state made in Gonzalez's affidavit; rather, the court was required to fathom Gonzalez's subjective state of mind at the time he entered his plea of guilty. And it was required to explore that matter in light of the representations made by Gonzalez

25

himself under oath in open court at the time of the plea and in light of "all of the relevant circumstances surrounding it," Brady, 397 U.S. at 749. And the court clearly proceeded to consider those relevant circumstances.

Although Gonzalez asserted that he had pleaded guilty only because he was under pressure to do so (Gonzalez Aff. ¶ 9), the only pressure he pointed to was the then-imminence of trial and his lack of confidence that Richman was "prepared[], . . . able or willing to address key issues for my defense" and lack of "trust that we could agree on a trial strategy" (id. ¶ 4). Although Gonzalez's affidavit asserted that Richman had not interviewed witnesses suggested by Gonzalez, that assertion was entirely conclusory. The assertion that Richman was "incapable, unwilling, and unprepared" to proceed to trial is a recurring theme in Gonzalez's brief on appeal. (E.g., Gonzalez brief on appeal at 18, 24, 32-33 (with emphasis), 33, 36, 44.) But his assertions are not supported by the record. For example, as to Richman's ability, we note that at the April 24, 2009 hearing the district court remarked that Richman was a "highly experienced and well qualified lawyer" (Apr. 24, 2009 Conf. Tr. 5). As to Richman's willingness and preparedness, we note that at that hearing, which took place two weeks before the then-scheduled start of trial, Richman (because of a recent death in the family) asked for an adjournment of just one week (see id. at 7-8). And although Gonzalez seeks to support his assertion that Richman was unprepared by (a) pointing out that Richman asked the court at the April 30, 2009 conference to award him Criminal Justice Act ("CJA") fees for trial and indicated that he had not expected the case to go to trial, (b) claiming that Richman "explained to the District Court that he was caught unprepared," and (c) stating that the district court gave Richman an "adjournment of the trial to May 11, 2009, providing Mr. Richman with less than two weeks to prepare for what was estimated to be a three week trial" (Gonzalez brief on appeal at 16), these assertions mischaracterize the record. While Richman did make a request for such CJA fees and indicated that he had not

26

expected the case to go to trial, he in no way indicated that he was not prepared for trial. The May 11 trial date had been set at the previous conference, and the record shows that before the April 30 conference Richman had, inter alia, already submitted to the court his proposed questions for voir dire.

Further, although Gonzalez repeatedly argues that he was under unfair pressure because Richman had an "ethical" problem in representing him--making a virtual mantra of the single word "ethical" in Richman's statement to the court at the April 24 conference (Gonzalez brief on appeal at 24, 32, 33, 38, 44)--the transcript of Richman's remarks makes clear that the conflict between Gonzalez and Richman centered simply on Gonzalez's view that he was innocent and Richman's view that he would be proven guilty, and that Richman would refuse to proceed in a manner that was unethical. Richman said:

> I am in no way impugning my client's integrity. I think it is just an honest breakdown in how a case can be handled. He is of the opinion that there is one course of conduct that can be taken and that establishes his non-guilt. And I am of the opinion that, frankly speaking, that it does not. So we are at a divergence. We can't communicate and we have not communicated and it is difficult to defend him personally under those circumstances.
>
> My concern is that I don't want to throw the weight on him. It is easy to do that and it would not be fair, but we are just not getting this thing done.
>
> I recognize, your Honor, this case is an old case and, at this stage, it should have been tried months ago, years ago or whatever. But I am at that position where, if I go forward, I believe that I am involved in an ethical problem.

(Apr. 24, 2009 Conf. Tr. 3-4.)

We see no abuse of discretion in the district court's conclusion that Richman's description of that "divergence" of views provided neither a basis for an eleventh-hour change of counsel or for the withdrawal of Gonzalez's subsequent plea of guilty. As noted in McKee v. Harris, 649 F.2d 927 (2d Cir. 1981), cited by the district court, see 2010 WL 1640186, at *6, "[a] lawyer has

27

a duty to give the accused an honest appraisal of his case," McKee v. Harris, 649 F.2d at 932 (internal quotation marks omitted). The fact that counsel "provided a pessimistic forecast[ ]does not rise to the level of good cause for substitution of counsel." Id. "The starting point for effective representation is a realistic assessment of the prospects of success in light of the risks of failure. It is precisely this balancing process which leads many defense lawyers to advise their clients to enter plea negotiations." Id. "Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism." Id. (internal quotation marks omitted).

Although when Gonzalez was first asked at the April 24 conference whether he was able to work with Richman he said, "At this time, no, your Honor," he indicated that that had been so for only "a couple of months" (Apr. 24, 2009 Conf. Tr. 5-6). When the court asked later in that conference whether Gonzalez would work with Richman, Gonzalez did not reiterate that he could not, and he did not urge the court to grant him new counsel; he told the court he would work with Richman. (See id. at 10.) And, as the district court found, Gonzalez's alleged "dispute with his attorney, if true, in no way bears upon the explicit representations Gonzalez made to this Court when it inquired if anyone had 'offered [Gonzalez] any inducements or threatened [him] or forced [him] to plead guilty.'" 2010 WL 1640186, at *6 (quoting May 2009 Plea Tr. 15; see also id. at 16 (Gonzalez was "pleading guilty voluntarily and of [his] own free will")).

Factors considered by the court that were relevant to Gonzalez's decision to plead guilty included the fact that on May 7, Gonzalez had received from the government a Pimentel letter outlining the government's views as to what Gonzalez's advisory Guidelines range of imprisonment would be if Gonzalez pleaded guilty to counts 2, 3, 6, and 8, thereby indicating that the government would drop the honest-services and other counts against Gonzalez. The court also considered the fact that two of Gonzalez's codefendants had pleaded guilty little more than a month before Gonzalez

decided to plead guilty and had become available to testify for the government. We note that although the memorandum of law submitted in support of Gonzalez's withdrawal motion mentioned only two individuals, "Victor Morisete and Ulina Barinas," as "the government's cooperating witnesses" (Gonzalez Withdrawal Motion Memorandum at 11), the government at the plea hearing had referred to evidence it would present through "the testimony of several cooperating witnesses" (May 8 Plea Tr. 18 (emphasis added)), and the record shows that two of Gonzalez's codefendants--Castanos and Neil Berger, the executive director of Pathways--had then recently entered guilty pleas. The district court found, as it was entitled to do, that Gonzalez's assertions were not more "plausible [than the] explanations offered by the Government," i.e., that Gonzalez had pleaded guilty to obtain the advantages offered by the Pimentel letter and to avoid having those two codefendants testify against him. The fact that coparties have just pleaded guilty and have become available to testify against the defendant does not constitute compulsion of the sort that would make the defendant's decision to plead guilty involuntary. See, e.g., Brady, 397 U.S. at 749-55.

Nor can we conclude that Gonzalez's other assertions carried his burden of showing that there was justification for the withdrawal of his plea of guilty. Although Gonzalez asserted in his affidavit that he wished to prove his "legal innocence" (Gonzalez Aff. ¶ 13) and that he had "never wavered in [his] desire to prove [his] legal innocence" (id. ¶ 4), his affidavit--and he submitted nothing else--did not refer to anything that would corroborate a claim of innocence. The district court rejected Gonzalez's terse statements as "perfunctory" and made no error in finding them insufficient and "[c]onclusory," 2010 WL 1640186, at *5.

Although Gonzalez asserted that he "decided to plead guilty [only] moments before the hearing began" (Gonzalez Aff. ¶ 9), the court was entitled to discredit that assertion given, inter alia, that the scheduling of the hearing on Gonzalez's desire to plead guilty had occurred the day before the hearing.

29

Although Gonzalez asserted in his affidavit, "I did not fully understand the import of my words" at the plea hearing (id.), the district court was entitled to reject that assertion as inherently incredible. The principal statements by Gonzalez under oath in his own words were that during specified periods as to West Bronx and ULAF respectively, "I and others were involved in an operation where we conspired to pay my personal expenses using funds of the" first, "West Bronx Neighborhood Association," and second, "the United Latin American Foundation, Incorporated." (May 2009 Plea Tr. 17.) With respect to each of those organizations Gonzalez stated, "I caused one of my coconspirators to mail" the organization's checks "to credit card companies," and to "vendors to pay my personal expenses." (Id.) The court was entitled to reject out of hand the assertion that Gonzalez, a lawmaker for nearly two decades, did not understand the import of those words.

Although Gonzalez's affidavit appears to attribute his claimed lack of understanding of the import of his words to his assertion that "[t]he majority of my allocution was read from a script" (Gonzalez Aff. ¶ 9), it is clear from the face of the transcript that he was not reading from a script when he answered the court's questions as to "how much money was involved with these two conspiracies" (May 2009 Plea Tr. 17). Gonzalez responded "200,000 or more" in toto, "[a]bout 125,000, 126,000, that I recall" as to West Bronx, and "40,000 or more," "40 to 75" with respect to ULAF. (Id.)

Although Gonzalez asserted in his affidavit that, at the plea hearing, "[w]hen questioned by the Court, I felt pressured to keep repeating 'yes'" (Gonzalez Aff. ¶ 9), it is noteworthy that when the court asked him if anyone had threatened or forced him, Gonzalez in fact answered "No, your Honor." In addition, the court noted that in the Advice of Rights Form signed by Gonzalez prior to the entry of his plea of guilty, Gonzalez stated that he "'[had] not been induced to plead guilty by any force, coercion, pressure or fear.'" 2010 WL 1640186, at *2 (quoting Court Exhibit 1).

30

And although Gonzalez asserted that he "almost immediately" "regretted" his May 8 plea of guilty and "wished to retract" it (Gonzalez Aff. ¶ 10), the district court was entitled to discredit that assertion, given that Gonzalez, again under oath, explicitly reaffirmed his plea of guilty on September 24 (see Sept. 2009 Plea Tr. 4-5), and given that even on November 9, at the conference at which Richman was finally relieved as Gonzalez's attorney, Gonzalez gave no indication that he wanted to withdraw his plea of guilty.

In sum, the district court found that Gonzalez's presentation in support of his motion to withdraw his plea of guilty was "bereft of any new facts that call into question his plea," 2010 WL 1640186, at *4, that "Gonzalez made a strategic decision based on an offer by the Government that inured to his benefit, and [that] nothing in the record shows his choice was involuntary." 2010 WL 1640186, at *6. Nothing in the record indicates to us that this finding is erroneous.

B. The 50-Victim Sentencing Enhancement

The advisory Guidelines require that a defendant's offense level be enhanced if his offense involved at least 10 victims. See Guidelines § 2B1.1(b)(2). "If the offense . . . involved 50 or more victims," the offense level is to be "increase[d] by **4** levels." Id. § 2B1.1(b)(2)(B). "'Victim,'" as used in § 2B1.1(b)(2), is defined to mean "any person [including individuals, corporations, and companies] who sustained any part of the actual loss determined under subsection (b)(1)." Guidelines § 2B1.1 Application Note 1.

The PSR, whose factual findings were not objected to by Gonzalez and were expressly adopted by the district court (see Sentencing Transcript, May 25, 2011 ("S.Tr."), at 34), found that the losses that resulted from Gonzalez's offenses totaled more than $400,000 but not more than $1 million, and that Gonzalez's Guidelines base offense level of 7 should thus be increased by 14 steps pursuant to § 2B1.1(b)(1)(H) (loss table). The PSR recommended, inter alia, an additional four-step

31

increase pursuant to § 2B1.1(b)(2)(B) on the ground that Gonzalez's offenses involved more than 50 victims. In support of the 50-victim enhancement, the government, with respect to the relevant period, submitted to the court, inter alia, Gonzalez's bills and credit card statements showing a total of some $590,000 in personal expenses; copies of West Bronx checks in payment of those expenses; copies of checks from Pathways to West Bronx totaling $462,500; and exhibits listing more than 50 individuals and corporate entities, whose donations to West Bronx by check totaled $122,775.

Gonzalez objected to the 50-victim enhancement on the ground that the government had not "'account[ed] for each dollar diverted,' [by] tracing it back to any specific donor" (Sentencing Memorandum on Behalf of Efrain Gonzalez, Jr. ("Gonzalez Sentencing Memorandum"), at 10 (quoting United States v. Arnaout, 431 F.3d 994, 999 (7th Cir. 2005))). He contended that "it's not sufficient just to say that there were more than 50 contributors" (S.Tr. 17), arguing that § 2B1.1(b)(2)(B) was inapplicable because the government had presented "no proof that [donors to West Bronx] submitted donations based on the understanding that the money would be used for a particular charitable purpose, **and no proof that any particular dollar given by a donor to West Bronx was used for an inappropriate purpose**" (Gonzalez Sentencing Memorandum at 10 (emphasis in original)).

At the sentencing hearing, the district court rejected Gonzalez's contention that § 2B1.1(b)(2) includes such a tracing requirement, having noted in colloquy with defense counsel (a) that "money is fungible" (S.Tr. 15); (b) that Gonzalez had "acknowledged . . . misappropriating moneys for his own personal gain"; and (c) that "[t]herefore, those moneys could not be used by the charities to help the people in need" (id. at 16-17). The court found that

the government's submissions clearly demonstrate that more than 50 people made charitable donations to West Bronx and the United Latin American Foundation. The record before this Court also reveals that these charities made hundreds of thousands of dollars in payments toward Mr. Gonzalez's personal expenses, including rent on a luxury apartment in the Dominican Republic and

32

a summer home in Monroe, New York. Gonzalez treated the bank accounts of these charities as if they belonged to him. Undoubtedly, <u>when people made charitable contributions, it was reasonable for them to expect that their contributions would be used to help the communities in the west Bronx and the Dominican Republic</u>. <u>By paying his personal bills, the contributions could not be used for their intended purpose</u>. Accordingly, in this Court's view, a four-level increase is warranted.

(S.Tr. 35-36 (emphases added).)

On appeal, although conceding that "WBNA enjoyed the support of more than 50 donors" (Gonzalez brief on appeal at 51), Gonzalez argues that the district court erred in applying § 2B1.1(b)(2)(B), because "it did so without requiring the government to provide evidence demonstrating that there were actually 50 individual victims" (Gonzalez brief on appeal at 47-48). Citing <u>United States v. Arnaout</u>, 431 F.3d at 999, he argues that "[m]any Circuits across the country require a district court to trace illegitimate expenditures back to individual victims before applying a number-of-victims sentencing enhancement." (Gonzalez brief on appeal at 51). He argues that for a 50-victim enhancement to be permissible, the government must "identify with specificity allegedly misdirected funds, and then trace those funds back to 50 individual victims." (Gonzalez brief on appeal at 48.) We reject his contentions.

The question of whether a given individual is a victim within the meaning of § 2B1.1(b)(2)--a question of Guidelines interpretation--is an issue of law. <u>See</u>, <u>e.g.</u>, <u>United States v. Skys</u>, 637 F.3d 146, 153 (2d Cir. 2011) ("<u>Skys</u>"); <u>United States v. Abiodun</u>, 536 F.3d 162, 169 (2d Cir. 2008). We review rulings of law <u>de novo</u>. <u>See</u>, <u>e.g.</u>, <u>Skys</u>, 637 F.3d at 152; <u>United States v. Vasquez</u>, 389 F.3d 65, 75 (2d Cir. 2004). "The number of persons or entities who are victims within the meaning of Guidelines § 2B1.1(b)(2) is . . . a question of fact." <u>Skys</u>, 637 F.3d at 152-53. A district court's factual findings at sentencing need be supported only by a preponderance of the evidence, <u>see</u>, <u>e.g.</u>, <u>United States v. Cossey</u>, 632 F.3d 82, 86 (2d Cir. 2011); <u>United States v. Gaskin</u>, 364 F.3d 438, 464 (2d Cir. 2004), and such findings may be overturned only if they are clearly

erroneous, see, e.g., Skys, 637 F.3d at 152.

We see no error in either the district court's ruling as to the proper interpretation of § 2B1.1(b)(2) or its finding that subsection (B) of that section is applicable to Gonzalez. The court properly rejected Gonzalez's contention that, before a person who has made a charitable contribution can be considered a victim within the meaning of § 2B1.1(b)(2), his donation must be traced to a particular misallocation by the defendant. A "victim" for purposes of § 2B1.1(b) is "any person [including individuals, corporations, and companies] who sustained any part of the actual loss determined under subsection (b)(1)," Guidelines § 2B1.1 Application Note 1 (emphasis added). A donor whose charitable contribution was included in the district court's finding of actual loss under § 2B1.1(b)(1) is thus, by definition, a victim within the meaning of § 2B1.1(b)(2). There is no suggestion in this definition or any other part of the Guidelines that the victim must be linked with a specific part of the loss.

Nor do we deem the cases cited by Gonzalez to require such a view. Although Gonzalez states that "[m]any Circuits across the country" impose a tracing requirement (Gonzalez brief on appeal at 51), he cites cases from only two Circuits, the Seventh and the Eleventh; and the Eleventh Circuit cases--only one of which is a published decision--simply represent application of the Guidelines definition of "victim" as one whose loss was part of the actual loss determined by the court under Guidelines § 2B1.1(b)(1). See, e.g., United States v. Foley, 508 F.3d 627, 633 (11th Cir. 2007) ("The district court erred when it adopted the number of responses received by the probation office as the number of victims for sentencing purposes. As explained earlier, the district court did not make an independent finding on the amount of loss, and the number of victims is defined in relation to the loss calculation."); United States v. Hernandez, 356 F. App'x 279, 284 (11th Cir. 2009) (government conceded that the district court had "failed to connect the victims to the actual losses they sustained"); United States v. Anderson, 286 F. App'x 654, 658 (11th Cir. 2008) (noting both the Guidelines

34

definition of victim as one whose loss was part of the court's calculation of actual loss and circuit precedent that "a district court err[s] in counting as victims, pursuant to U.S.S.G. § 2B1.1(b)(2), individuals who did not suffer any part of the actual loss").

The only case Gonzalez cites--and the only case we have seen--that even arguably imposes a tracing requirement such as that advocated by Gonzalez is United States v. Arnaout. In that case, although the Seventh Circuit stated that it "agree[d]" with the defendant's contention that the district court had "erred when it failed to account for each dollar diverted and did not trace each diverted dollar back to a specific donor," 431 F.3d at 999, there were charitable contributions by some 17,000 donors totaling more than $17,000,000, but an actual loss amount of only some $300,000. In its discussion, the court concluded that "[t]here [wa]s insufficient evidence in the record to support a calculation of the number of donors that contributed the approximate $300,000," and that the court did not see "proof by a preponderance of the evidence in the record that at least fifty donors contributed the amount attributable to Arnaout." Id. We are thus inclined to interpret the Seventh Circuit's reversal of the 50-victim enhancement in that case as resting simply on problems in determining how many donors contributed to the actual loss amount. In any event, to the extent that the court meant to adopt a requirement that particular misused funds be traced back to specific donors, that decision is not binding on this Court and we decline to follow it.

As Guidelines commentary observes elsewhere, "defendants who exploit victims' charitable impulses or trust in government create particular social harm." Guidelines § 2B1.1 Application Note 19(D). We see no intent in the multiple-victim-enhancement provision of the Guidelines to exacerbate societal harm by rewarding a defendant who simply commingles fraudulently obtained charitable contributions before spending them.

Finally, we see no error, much less any clear error, in the district court's finding that the number of persons within the Guidelines definition of victim exceeded 50. The district court

found that the actual loss caused by Gonzalez's offenses totaled more than $400,000 but not more than $1 million. The government's submissions showed that West Bronx funds used to pay Gonzalez's personal expenses totaled some $590,000; that West Bronx had received a total of some $585,275, including $462,500 from Pathways, and $122,775 in small contributions from others; and that West Bronx's lists of the latter group of contributions showed that they came from more than 50 donors. These submissions by the government were ample to permit the district court to find by a preponderance of the evidence that Gonzalez's offenses involved more than 50 victims. Ordinarily, a not-for-profit corporation formed for charitable purposes, rather than the corporation's charitable donors, is the victim of any theft from the organization's coffers. Here, however, the preponderance of the evidence demonstrates that WBNA and ULAF were sham organizations established specifically for the purpose of channeling donor and grant funds to Gonzalez for his personal use. The donors relied on misrepresentations as to the intended uses of those funds and therefore were Gonzalez's victims.

C. The Restitution Order

In its August 23, 2010 restitution order, entered under the Mandatory Victims Restitution Act ("MVRA"), which is codified largely at 18 U.S.C. §§ 3663A and 3664, the district court ordered Gonzalez to pay a total of $122,775 to the WBNA contributors listed in the government's submissions discussed in Part II.B. above. The MVRA provides, in part, that in sentencing a defendant convicted of a felony committed by fraud or deceit, the court "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. §§ 3663A(a)(1) and (c)(1)(A)(ii). The MVRA defines "victim" in relevant part to mean "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Procedures to be followed in

connection with restitution orders are set out in 18 U.S.C. § 3664. Gonzalez makes two challenges to the restitution order, one procedural and the other substantive. We find potential merit only in one aspect of his substantive challenge.

As a matter of procedure, Gonzalez contends that the restitution order should be canceled because the government failed to comply with the MVRA requirements that it, inter alia, consult with all identified victims prior to Gonzalez's sentencing and provide the Probation Department with a list of victims and their losses in time for that department to give notice to the victims and receive information from them as to their losses, see 18 U.S.C. § 3664(d). Even if Gonzalez's factual contentions on this point are accurate, the MVRA itself does not specify the consequences for such failures, and we cannot conclude that restitution should be canceled on that account. The Supreme Court has recently ruled that because the MVRA, for the specified types of offenses, makes restitution mandatory, places heavy emphasis on the full compensation of victims, and does not specify consequences for failing to meet an MVRA deadline, noncompliance with a deadline "does not deprive the court of the power to order restitution," Dolan v. United States, 130 S. Ct. 2533, 2539 (2010). In light of Dolan, we conclude that cancellation of the district court's August 23, 2010 restitution order would be an inappropriate remedy for the government's noncompliance with procedures that were plainly designed to benefit the crime victims.

As a matter of substance, Gonzalez principally makes two types of argument: that the West Bronx donor lists submitted by the government were (a) insufficient to identify the donors as victims and (b) insufficient to quantify their losses. In support of his identification contention, Gonzalez makes the same tracing argument he advanced in opposition to the Guidelines 50-victim enhancement, see Part II.B. above, contending that the government was required to "specifically identify[] diverted funds used for illegitimate purposes[ and] trac[e] those funds back to direct individual victims" (Gonzalez brief on appeal at 58). Given the MVRA definition of victim, i.e., "a

37

person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," 18 U.S.C. § 3663A(a)(2), we find no greater merit in the tracing contention in this context than in the context of the 50-victim Guidelines enhancement.

Gonzalez also states that "it is unclear whether any of the [persons whose names are on the West Bronx donor ledgers] even consider themselves to be victims" (Gonzalez brief on appeal at 57). This argument is wide of the mark, for the matter of whether a person is a "victim" within the meaning of the MVRA is an issue of law. See, e.g., United States v. Holthaus, 486 F.3d 451, 457 (8th Cir. 2007). West Bronx, in soliciting contributions in connection with its galas, held itself out to be a civic organization whose "net earnings" would be "devoted exclusively to charitable, educational, or recreational purposes," "exclusively for the promotion of social welfare," 26 U.S.C. § 501(c)(4). (See, e.g., Government Exhibit 526 (a "Fiesta González Gala Birthday Party" solicitation stating, "Please make checks payable to: **West Bronx Neighborhood Association, Inc.[,] A Not For Profit Organization §501(c)(4)**" (emphasis in original))). We see no error in the district court's ruling that persons who made charitable contributions to a § 501(c)(4) organization whose funds were fraudulently diverted to pay the personal expenses of Gonzalez were victims of that fraud within the meaning of the MVRA.

We have greater difficulty, however, with the district court's acceptance of the West Bronx donor lists submitted by the government as adequate to quantify the donors' losses. Gonzalez contends that although the checks shown for the various West Bronx galas total $122,775, that amount overstates the donors' losses because some donors received value in return for their donations. The MVRA provides that

> "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court . . . . Id. § 3664(f)(1)(A).

> The purpose of restitution is to compensate victims for their losses. See, e.g., Hughey v. United States, 495 U.S. 411, 416 . . . (1990), superseded

38

by statute, Crime Control Act of 1990, Pub. L. No. 101-647 § 2509, 104 Stat. 4789, 4863 (codified at 18 U.S.C. § 3663(a)(3)); United States v. Boccagna, 450 F.3d 107, 115 (2d Cir.2006) ("Boccagna"); United States v. Reifler, 446 F.3d 65, 137 (2d Cir.2006) ("Reifler"); United States v. Nucci, 364 F.3d 419, 423-24 (2d Cir.2004) ("Nucci").

> In determining the appropriate measure of value for property relevant to restitution, a district court must consider that the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury. See Hughey v. United States, 495 U.S. 411, 416, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990) (observing that the "meaning of 'restitution' is restoring someone to a position he occupied before a particular event"); United States v. Coriaty, 300 F.3d 244, 253 (2d Cir.2002) (holding that "statutory focus" of the MVRA is "upon making victims whole"). Because the MVRA mandates that restitution be ordered to crime victims for the "full amount" of losses caused by a defendant's criminal conduct, see 18 U.S.C. § 3664(f)(1)(A); United States v. Reifler, 446 F.3d at 134 . . . , it can fairly be said that the "primary and overarching" purpose of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." United States v. Simmonds, 235 F.3d [826, 831 (3d Cir.2000)].

Boccagna, 450 F.3d at 115.

United States v. Pescatore, 637 F.3d 128, 138-39 (2d Cir. 2011) (emphases ours). "Section 3663A does not," however, "authorize the court to order restitution to victims in excess of their losses." Id. at 139 (emphasis added); see, e.g., Reifler, 446 F.3d at 122-35; Boccagna, 450 F.3d at 109; Nucci, 364 F.3d at 423-24.

Gonzalez has argued that an order granting persons on the West Bronx donor lists restitution in the full amount of the checks they sent in connection with a gala birthday party may well grant them restitution in excess of their losses. The lists themselves indicate that some of the checks were sent in connection with advertisements to appear in the event programs. And we note that in Government Exhibit 526, West Bronx offered gala tickets for up to $1,000 (a "Benefactor" ticket) and promised, inter alia, a "Buffet Supper" and an "Open Bar." Some of the checks bear notations indicating that they were for dinners.

It may well be that some of the listed donors made contributions and received nothing in return. In the course of discussing who could properly be considered a victim within the Guidelines definition governing the 50-victim enhancement, both the government and the district court suggested that the West Bronx donors believed "100 percent of their money" would be used for charity (see S.Tr. 24, 17); but that seems unlikely or unrealistic for those who attended a West Bronx gala. And to the extent that donors received food and drink, or to the extent that businesses purchased advertisements in the gala printed program, it would appear that they received some value for their contributions. Indeed, the federal tax laws disallow a charitable deduction for so much of a contribution as is attributable to a benefit to the donor; and donees are required to provide donors with estimates of the fair market value of the consideration that donors receive for their contributions. See 26 C.F.R. § 1.170A-1(h) (2010).

Although the court's suggestion that a donor expected 100 percent of his contribution to be used for charitable purposes did not mar the determination of whether donors were victims, it does, in light of the record, raise questions with respect to the accuracy of its quantification of the donors' losses. As the court's restitution order accepted the premise in all instances that the amount donated constituted the amount of the donor's loss, we vacate that order and remand for further proceedings to determine to what extent donors suffered losses and for the entry of a restitution order that awards a donor restitution in the full amount of, but not in excess of, his, her, or its loss.

CONCLUSION

We have considered all of the parties' contentions in support of their respective positions and, except as indicted above, have found them to be without merit. We vacate the August 23, 2010 order and remand for further proceedings with respect to the amount of restitution to be ordered. The judgment of conviction and all other aspects of Gonzalez's sentence are affirmed.